*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 88**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellant,*

*v.*

MICHAEL ROWAN and REBECCA GEORGE,
*Appellees.*

No(s). 20150598, 20150599
Filed December 1, 2017

On Direct Appeal

Fourth District, Provo
The Honorable Derek P. Pullan
No(s). 131402290, 131402291

Attorneys:

Sean D. Reyes, Att'y Gen.,
Jeffrey S. Gray, Asst. Solic. Gen., Salt Lake City,
for appellant

Richard P. Gale, Provo, for appellee Michael Rowan

Douglas J. Thompson, Provo, for appellee Rebecca George

Paul G. Cassell, Salt Lake City, James M. Swink, Logan,
for amici Utah Council on Victims of Crime

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE DURHAM[*], and JUSTICE HIMONAS joined.

JUSTICE HIMONAS filed a concurring opinion, in which
CHIEF JUSTICE DURRANT and JUSTICE DURHAM joined.

ASSOCIATE CHIEF JUSTICE LEE filed an opinion concurring in the
result, in which JUSTICE PEARCE joined.

_____

[*] Justice Durham sat on this case and voted prior to her retirement
on November 15, 2017.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1    In this case we consider a magistrate's determination of probable cause supporting a search warrant. A confidential informant (CI) told a police officer that he had bought marijuana from a man he knew only as "Mike" in Mike's house. In exchange for leniency on pending criminal charges, the CI agreed to make a controlled buy. After the CI completed the controlled buy, the officer submitted an affidavit to establish probable cause for a warrant to search Mike's house. The warrant was signed by a magistrate and executed by police. Mike's house was occupied by defendants Michael Rowan and Rebecca George. The police found drugs, drug paraphernalia, buy-owe sheets, firearms, and a large amount of cash.

¶ 2    Mr. Rowan and Ms. George moved under the state and federal constitutions to suppress the result of the search, challenging the magistrate's probable cause determination. The district court found that there was no probable cause, but it also determined that the federal good faith exception to the exclusionary rule applied. Defendants moved again to suppress the evidence, this time arguing that it should be excluded under article I, section 14 of the Utah Constitution. The court suppressed the evidence under the state constitution, concluding that the state constitution contains an exclusionary rule, but does not include a good faith exception. The State dismissed the charges due to lack of evidence and appealed.

¶ 3    On appeal, we are asked to consider (1) whether there was a substantial basis for the magistrate's probable cause determination; (2) whether this court recognized an exclusionary rule under article I, section 14 of the Utah Constitution in *State v. Thompson*[1] and *State v. Larocco*;[2] and (3) if we did recognize an exclusionary rule under the Utah Constitution, whether there should be a good faith exception. Because we conclude that there was a substantial basis for the magistrate's probable cause determination and that therefore the evidence should not have been suppressed, we do not reach the questions of whether we have recognized an exclusionary rule under article I, section 14 of the Utah Constitution or whether there should

---

[1] 810 P.2d 415 (Utah 1991).

[2] 794 P.2d 460 (Utah 1990) (plurality opinion).

be a good faith exception to such a rule. We therefore reverse the district court.

## Background

¶ 4 A confidential informant (CI) reported to a Springville City police officer that a man whom the CI knew only as "Mike" was in possession of marijuana and would sell it to the CI. The CI told the officer that he had been in Mike's home and purchased drugs from Mike before. The CI also told the officer that Mike sold marijuana in bulk and "his product [was] vacuum sealed"; that Mike traveled to California to obtain marijuana to sell in Utah; that Mike kept the marijuana inside his house, although the CI did not know where; that Mike was a master of martial arts; and that the CI had heard Mike talking about firearms and he believed Mike had a firearm in the house.

¶ 5 The police officer tried to determine Mike's identity, but record checks on the residence, registration checks on vehicles, and inquiries to other agencies were unsuccessful. He then proposed that the CI assist in a controlled buy of marijuana from Mike, in exchange for leniency on the CI's pending criminal charges. The CI agreed to participate.

¶ 6 Before the controlled buy, police searched the CI and found no illegal items. Then, in the presence of the police, the CI called Mike and arranged to buy a specific amount of marijuana for a specific amount of money. After receiving the money for the buy from the police, the CI drove in his own car to Mike's residence. The police did not search the CI's car, but kept the car and the CI in "visual sight at all times." The CI drove directly to Mike's house and went inside.

¶ 7 After a short time had passed, the CI left the residence and drove to a predetermined location to meet with the affiant police officer. The CI reported that after he entered Mike's house, he used the money given to him by the police to buy marijuana from Mike. The police searched the CI and found the agreed-upon amount of marijuana.

¶ 8 The police officer prepared an affidavit, which presented both the information about "Mike" conveyed to him by the CI and the details of the controlled buy. Relying on the police officer's affidavit, a magistrate issued a warrant authorizing the search of a Provo residence, the home of defendants Michael Rowan and Rebecca George.

¶ 9   After securing the warrant, police searched the defendants' home and found over four pounds of marijuana, psilocybin mushrooms, drug paraphernalia, buy-owe sheets, more than $3,600 in cash, an assault rifle, and a handgun. The drugs and related paraphernalia were found throughout the home and were easily accessible to the defendants' minor child, who was living in the home and present when the police entered the home.

¶ 10 Mr. Rowan was charged with (1) distributing marijuana in a drug-free zone, a second degree felony; (2) possessing marijuana with intent to distribute in a drug-free zone while having a prior drug-related conviction, a first degree felony; (3) possessing or using psilocybin mushrooms in a drug-free zone while having a prior drug-related conviction, a first degree felony; (4) possessing a firearm as a restricted person, a third degree felony; (5) possessing drug paraphernalia in a drug-free zone, a class A misdemeanor; and (6) endangering a child, a third degree felony. Ms. George was charged with endangering a child, a third degree felony.

¶ 11 At the district court, Defendants argued under the Fourth Amendment that the warrant was not supported by probable cause and moved to suppress the evidence seized in the search of their home. In response, the State argued that the magistrate had a substantial basis for finding probable cause, but even if he did not, that the evidence should not be suppressed under the federal good faith exception, which allows for admission of evidence when police reasonably rely on a magistrate's incorrect finding of probable cause. The district court concluded that the magistrate incorrectly determined that the warrant was supported by probable cause, but the court applied the federal good faith exception and did not suppress the evidence.

¶ 12 Defendants filed a "motion to address [the] good faith exception under [the] Utah Constitution," arguing that the federal good faith exception "is prohibited by the Utah State Constitution." The State argued in response that there is no basis for an exclusionary rule under the Utah Constitution and, even if there were, a state exclusionary rule should include a good faith exception analogous to the federal exception. Relying on this court's decision in *State v. Thompson*,[3] the district court concluded that a state exclusionary rule is required under the state constitution, but that "there is no good faith exception to the exclusionary rule under

---

[3] 810 P.2d 415 (Utah 1991).

article I, section 14" of the Utah Constitution. The court granted Defendants' motion to suppress the evidence seized in the search of their home.

¶ 13 On the State's motion, the district court dismissed the charges against Defendants on the ground that the suppression of evidence substantially impaired the State's cases. The State timely appealed both cases. This court has jurisdiction to hear this appeal pursuant to Utah Code section 78A-3-102(3)(i) in Mr. Rowan's case and Utah Code section 78A-3-102(3)(b) in Ms. George's case.[4]

**Standard of Review**

¶ 14 We review a district court's assessment of a magistrate's probable cause determination for correctness and ask whether the court erred in concluding that the magistrate did not have a substantial basis for a determination of probable cause.[5]

---

[4] After we elected to retain Mr. Rowan's case, the court of appeals certified Ms. George's case for transfer to this court.

[5] *See State v. Walker*, 2011 UT 53, ¶ 12, 267 P.3d 210.

Defendants argue that there should be a different, potentially more stringent, standard of review in probable cause cases under the Utah Constitution. They argue that there is a lower standard of review in warrant cases under the federal constitution and that this court should "implement[] a Utah standard of review that requires warrants to be supported by probable cause, period." They articulate their suggested standard of review as "this [c]ourt's traditional mixed question standard, reviewing factual findings for clear error and the existence of probable cause for correctness."

Defendants did not present this question to the district court. The district court performed an appellate function when it reviewed the magistrate's determination of probable cause. This review would have necessarily involved an opportunity for the parties to present argument on the standard of review to be applied by the district court. Defendants presented no legal arguments to that court regarding the applicable legal standard under which it should conduct that review. Defendants' first motion to suppress mentioned the state constitution only in passing and relied on cases that do not distinguish between the state and federal standards. The district court did not address Defendants' state constitutional claims until its order on Defendants' second motion to suppress, which addressed only the exclusionary rule and good faith exception under article I,

(Continued)

## Analysis

¶ 15 The State argues that the magistrate had a substantial basis for finding probable cause and that the district court did not afford the magistrate's probable cause determination "great deference," but "reviewed the probable cause affidavit de novo." Defendants argue that the district court correctly concluded that the affidavit did not establish a substantial basis for probable cause, pointing to the court's consideration of the "CI's lack of credibility, the officer's failure to corroborate any of [the CI's] claims, and the complete lack of control over the buy." We agree with the State that the district court did not give the magistrate appropriate deference and that the affidavit provided a substantial basis for the magistrate's determination of probable cause.

¶ 16 "Where a search warrant supported by an affidavit is challenged as having been issued without an adequate showing of probable cause, our review focuses on the magistrate's probable cause determination."[6] "We afford the magistrate's decision 'great deference' and consider the affidavit relied upon by the magistrate 'in its entirety and in a common[]sense fashion.'"[7] This court has "consistently employed" the totality of the circumstances analysis set forth by the United States Supreme Court in *Illinois v. Gates* to evaluate probable cause:[8]

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[9]

---

section 14. The question of the standard of review under which reviewing courts assess a magistrate's determination of probable cause is therefore unpreserved, and we decline to reach it. *See Winward v. State*, 2012 UT 85, ¶ 9, 293 P.3d 259.

[6] *State v. Norris*, 2001 UT 104, ¶ 14, 48 P.3d 872.

[7] *Id.* (alteration in original) (citation omitted).

[8] *State v. Saddler*, 2004 UT 105, ¶ 11, 104 P.3d 1265.

[9] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"[A]n informant's 'reliability' and 'basis of knowledge' are but two relevant considerations, among others, in determining the existence of probable cause under 'a totality-of-the-circumstances.'"[10] "The indicia of veracity, reliability, and basis of knowledge are nonexclusive elements to be evaluated in reaching the practical, common-sense decision whether, given all the circumstances, there is a fair probability that the contraband will be found in the place described."[11]

¶ 17 "[W]hen a search warrant is issued on the basis of an affidavit, that affidavit must contain specific facts sufficient to support a determination by a neutral magistrate that probable cause exists."[12] Probable cause cannot "be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based."[13] But "where [underlying] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner."[14] In determining whether an affidavit demonstrates the existence of probable cause, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."[15]

¶ 18 In this case, the district court did not afford the magistrate "great deference" and instead read the affidavit "in a hypertechnical, rather than commonsense, manner." The court began by finding that the buy was not controlled, because police failed to search the CI's car before and after the buy. Based on this finding, the court concluded that the police had failed to corroborate the CI's information. This in turn negated the CI's personal knowledge of

---

[10] *State v. Hansen*, 732 P.2d 127, 130 (Utah 1987) (quoting *Gates*, 462 U.S. at 233–34).

[11] *Id.*

[12] *State v. Babbell*, 770 P.2d 987, 990 (Utah 1989).

[13] *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965) (citation omitted).

[14] *Id.* at 109.

[15] *Id.*

Mike and his implication of himself in criminal activity, as the court reasoned, "these factors standing alone—without independent corroboration—cannot in this Court's view give rise [to] a finding of probable cause." Accordingly, the district court concluded that the affidavit did not establish probable cause.

¶ 19 We disagree. When considered "in its entirety and in a common sense fashion,"[16] the affidavit is sufficient to support the magistrate's determination of probable cause that contraband would be found at Mike's house. The affidavit was not conclusory, but contained specific facts, detailing both the underlying circumstances and the affiant officer's reasons for crediting the CI's information. The underlying circumstances included the following: the affiant officer had met the CI within 72 hours of preparing the affidavit; the CI had told the officer that an individual known to the CI as Mike sold marijuana in bulk and "his product [was] vacuum sealed"; Mike traveled to California to obtain marijuana to sell in Utah; Mike kept the marijuana inside his house, although the CI did not know where; the CI had heard Mike talking about firearms and he believed Mike had a firearm in the house; Mike was a master of martial arts; and Mike lived with his girlfriend and their minor child. The officer credited the information given to him by the CI for these reasons: the CI had "made drug purchases" from Mike; the CI was "familiar with drug distribution and drug practices"; and the CI would receive leniency for pending charges for participating in the controlled buy. The affiant officer further concluded that by implicating himself in criminal activity, the CI bolstered his reliability.[17]

¶ 20 The affidavit also detailed the affiant officer's attempts to corroborate the CI's information by checking records, vehicle registrations, and requesting information from other agencies. When those attempts to corroborate proved fruitless, the officer arranged the controlled buy to corroborate the CI's information. And although

---

[16] *Saddler*, 2004 UT 105, ¶ 7 (citation omitted).

[17] *See id.* ¶ 18 (citing *United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.")(alteration in original)).

the controlled buy may not have been perfectly executed,[18] police sufficiently controlled the buy through the following measures: the police searched the CI before the buy; they supervised the CI's call to Mike; the CI arranged to purchase a specific amount of marijuana for a specific amount of money at Mike's residence; the police gave the CI the agreed upon amount of money; the CI drove his own car to Mike's residence, but police followed him, maintaining "visual sight at all times"; the CI entered Mike's residence and was shortly seen leaving Mike's residence; the police again followed the CI as he drove his own car; the CI drove to a prearranged location to meet with the affiant officer; the CI had the agreed-upon distributable amount of marijuana in his possession; and the police again searched the CI, finding no additional illegal items. Even if under best practices the police should have searched the car before and after the controlled buy, this does not negate the magistrate's finding of probable cause. The totality of the circumstances, as presented in the affidavit, was sufficient to give rise to probable cause.

## Conclusion

¶ 21 We conclude that the magistrate had a substantial basis to determine there was probable cause based on the affidavit's description of the information the CI reported to the police and the results of the controlled buy. The judgment of the district court is reversed.

—————————

JUSTICE HIMONAS, concurring:

## INTRODUCTION

¶22 I concur in full in Chief Justice Durrant's excellent opinion. I write separately only to explain my decision to decide this case on

---

[18] *See United States v. Artez*, 389 F.3d 1106, 1111–12 (10th Cir. 2004) (stating that the "common formalities observed by police officers when conducting . . . controlled purchases are as follows: the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant" (footnote omitted)).

settled principles and to avoid unnecessarily roiling constitutional waters. In my opinion, "[b]efore embarking on a review of the constitutional principles underlying . . . [the state exclusionary rule], proper concern for *stare decisis* joins with our long-standing policy of avoiding unnecessary constitutional decisions to counsel that a decision on the continuing vitality of . . .[the state exclusionary rule] be avoided unless it is really necessary." *Elkins v. Moreno*, 435 U.S. 647, 660–61 (1978). So while I respect Associate Chief Justice Lee's right "to articulate an alternative ground for reversal," I believe the majority is right to decline to revisit today our precedents recognizing that the Utah Constitution embodies the suppression remedy for unlawful searches and seizures. *Infra* ¶ 36; *see State v. Larocco*, 794 P.2d 460 (Utah 1990).

## ANALYSIS

¶23 The Associate Chief Justice rightly notes that we have the "discretion to decide any and all issues presented for review," including, in this case, the viability of the state exclusionary rule. *Infra* ¶ 59. But having discretion is not the same as prudently exercising it. For this reason, we have said time after time that "when possible, we [will] decline to address issues beyond the narrowest applicable grounds." *Alliant Techsystems, Inc. v. Salt Lake Bd. of Equalization*, 2012 UT 4, ¶ 27 n.41, 270 P.3d 441. Here, a confluence of prudential considerations—*stare decisis*, constitutional avoidance, judicial restraint, and long-standing custom—argue against revisiting the state exclusionary rule.

¶24 As a general rule, our court declines to revisit established precedent unnecessarily. *See State v. Levya*, 951 P.2d 738, 743 (Utah 1997) ("[W]e decline to disrupt established precedent unnecessarily . . ."). This principle is deeply rooted in the rule of law. The refusal to unnecessarily reconsider our precedents "forges certainty, stability, and predictability in the law. It also reinforces confidence in judicial integrity and lays a foundation of order upon which individuals and organizations in our society can conduct themselves." *State v. Shoulderblade*, 905 P.2d 289, 292 (Utah 1995). It flows directly from a commitment to judicial restraint. *See McGhee v. Commonwealth*, 701 S.E.2d 58, 61 n.4 (Va. 2010) ("[F]aithful adherence to the doctrine of judicial restraint warrants decision of cases 'on the best and narrowest grounds available'." (quoting *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 531 (1991) (Stevens, J., concurring))).

¶25 The principle applies with particular force when the established precedent at issue has constitutional dimensions.

"[C]onstitutional adjudication" is of "paramount importance . . . in our system." *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 571 (1947). In light of the "great gravity and delicacy" of constitutional questions, as Justice Brandeis put it in his famous concurrence in *Ashwander v. Tennessee Valley Authority*, "[t]he Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." 297 U.S. 288, 346–47 (1936). Additionally, because of the paramount importance of constitutional adjudication, we assume that when our court has previously adjudicated a constitutional issue, it has not rushed headlong to reach the constitutional question, but has, instead, acted with the utmost care. *Cf. W. Va. ex rel. Rist v. Underwood*, 524 S.E.2d 179, 182 (W. Va. 1999) ("Any examination of our Constitution—the organic law of our State—must proceed with utmost care and concern for the future impact of our decision."). We expect future courts will, in turn, presume this of us. And so we pay it forward; an appropriate respect for past courts—which, carried through time, is the thread that holds it all together—requires us to revisit our constitutional precedents cautiously and only when we must. *See Shoulderblade*, 905 P.2d at 292 ("Stare decisis . . . . reinforces confidence in judicial integrity . . . ."); *see also Levya*, 951 P.2d at 743.

¶26 The Associate Chief Justice disagrees. In his view, even when a case can be decided on narrower grounds, there is little reason to avoid revisiting constitutional questions made by past iterations of this court—at least where doing so will "[de]constitutionaliz[e] a remedy." *Infra* ¶ 54. This is because, in the Associate Chief Justice's view, constitutional restraint—what he calls "constitutional avoidance"—is premised on concern about insulating "constitutional decision[s] . . . from review or reconsideration by the political branches of our government." *Infra* ¶ 57. Put another way, the Associate Chief Justice largely conceives of constitutional avoidance as what we might call "the presumption against recognizing constitutional rights." In his view, courts should avoid taking up constitutional questions only if they think those questions might result in the extension or entrenchment of constitutional rights. But they should not let norms of constitutional avoidance—or restraint—stand in their way if they are tempted to walk back (or not recognize) constitutional rights.

¶27 I disagree. The Associate Chief Justice is surely right that one consideration underlying constitutional avoidance is that, when we take up a constitutional question, we will potentially interfere with the elected branches' policymaking power. But this is not the

sole value underlying our reluctance to revisit constitutional issues. We have already reviewed many of these considerations: respect for the wisdom of prior courts (especially when those courts have undertaken the awesome responsibility of interpreting our constitution), a commitment to stability, and judicial restraint. Yet another consideration is simple humility: hard problems call for percolation. Absent an extended process of reflection and analysis, our decision may well "be the product of initial inadvertence made difficult to dislodge by precedents based upon the initial inadvertence." *Hinkle v. Alexander*, 411 P.2d 829, 830 (Or. 1966) (Denecke, J., specially concurring). As Justice Brandeis noted in *Ashwander*, aside from "[c]onsiderations of propriety," "long-established practice" militates against "passing upon the constitutionality of an act . . . unless obliged to do so." *Ashwander*, 297 U.S. at 341 (Brandeis, J., concurring) (internal quotation marks omitted). This is yet another reason to avoid revisiting our constitutional precedents unless necessary. When a practice of restraint is durable—when it has survived several turns of the wheel—a wise humility counsels against discarding it.

¶28 The Associate Chief Justice accepts much of my framework for the exercise of judicial restraint. *Infra* ¶¶ 57–58. But he thinks *Larocco* and *Thompson*'s recognition of a state exclusionary rule was such an egregious misstep that this is the rare case in which we should revisit our precedent notwithstanding the fact that this case presents an uncontroversial alternative basis for decision. In the Associate Chief Justice's view, open questions about the scope of the state exclusionary rule are "fostering uncertainty and litigation in the lower courts" to such a degree that we should reach out and repudiate our precedents unnecessarily. *Infra* ¶ 64.

¶29 The Associate Chief Justice's position collapses on itself. If the state exclusionary rule really does present that rare case where there is such a pressing need to revise our doctrine that we ought to bypass a clear, narrow, alternative basis for decision to reach it, then there will surely come a case soon that we will have to resolve on state exclusionary grounds. And that will present the proper occasion for reconsidering our precedent. And if that case doesn't come before us soon? Then that is strong reason to think that the Associate Chief Justice's urgent workability concerns are overblown.

¶30 Finally, consider what would happen if we did reach out and repudiate the state exclusionary rule here. If we were to repudiate the state exclusionary rule, we would create a policy void: a void that would have to be filled by our courts' exercising their common law authority unless and until the legislature chose to

intervene. Thus, absent quick and comprehensive legislative intervention, we would, at best, be exactly where we were before we rejected the state exclusionary rule. And litigants (and the police) might be in an even worse position from the perspective of predictability: uncertain of both the nature of the remedy for search-and-seizure violations (suppression, monetary damages, something else?) *and* the applicability of any exceptions.

¶31 In my view, prudence, practice, and humility all argue against revisiting our constitutional precedents unnecessarily. The Associate Chief Justice is certainly right that revisiting those precedents would promote *one* interest here—freeing up space for policymaking by the elected branches. But it would do so at the cost of judicial norms and judicial humility. Therefore, I believe it would be imprudent for us to reach the constitutional question in this case.

The state exclusionary rule was first recognized over twenty-five years ago in *State v. Larocco*, 794 P.2d 460 (Utah 1990), and it was then reaffirmed, a year later, in *State v. Thompson*, 810 P.2d 415 (Utah 1991).[19] Until such time as the continued viability of that rule is

---

[19] The Associate Chief Justice claims that *Larocco* and *Thompson* rest on shaky ground because *Larocco* was a plurality and *Thompson*, though a majority, blindly adhered to *Larocco* without recognizing that *Larocco* was not binding precedent. *See State v. Walker*, 2011 UT 53, ¶ 39, 267 P.3d 210 (Lee, J., concurring) (arguing that *Larocco* was a "plurality" and that "a majority in *Thompson* casually embraced the *Larocco* plurality position as the law of this state"); *see also infra* ¶ 73 (characterizing *Larocco* as a "plurality"). This contention does not withstand review. *Thompson* was issued less than a year after *Larocco*, and it was authored by one of *Larocco's* dissenters. But more than that, in *Sims v. Collection Division of the Utah State Tax Commission*, one of the dissenters in *Larocco* went *out of his way* to acknowledge that "[t]he state exclusionary rule came into existence on the vote of a majority of this court in *State v. Larocco*, 794 P.2d 460 (Utah 1990)," and that the dissent disagreed only with "the application of the rule to the facts of that case." 841 P.2d 6, 16 (Utah 1992) (Howe, A.C.J., dissenting).

squarely before us, we should respect our precedent and decline to revise it unnecessarily. Because *stare decisis* is "a cornerstone of Anglo-American jurisprudence that is crucial to the predictability of law and the fairness of adjudication," *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993), "we do not overrule our precedents lightly," *State v. Guard*, 2015 UT 96, ¶ 33, 371 P.3d 1 (internal quotation marks omitted). We should not do so here.

## CONCLUSION

¶32 There may well come a time and a case that calls upon us to evaluate our precedents on the state exclusionary rule. But that time and case should arise organically and within established norms. And, in my view, proper respect for the principles underlying judicial restraint, constitutional avoidance, and *stare decisis* tells us that today is not the time and this is not the case.

---

ASSOCIATE CHIEF JUSTICE LEE, concurring in the result:

¶33 The majority reverses the district court's decision suppressing evidence secured under a search warrant signed by a magistrate and executed by the police. It does so on the ground that there was a substantial basis for the magistrate's determination that there was probable cause for issuance of the warrant in question. And for that reason the court stops short of reaching broader constitutional questions presented by this case.

¶34 I concur in the majority opinion. I am persuaded by the Chief Justice's analysis of the grounds for finding probable cause sufficient to justify the issuance of the warrant in this case. *See supra* ¶¶ 18–20.

¶35 I write separately, however, to articulate an alternative ground for reversal. That ground was briefed by the parties and squarely presented for our decision. It concerns the appropriate remedy for a violation of the search and seizure provision of the Utah Constitution—by way of an exclusionary rule or some other remedy.

¶36 The majority is right to say that its decision on the probable cause issue makes it unnecessary for us to reach the question of the proper remedy for an unconstitutional search. But appellate courts retain the discretion to reach alternative grounds for decision. And I would reach this question here for reasons set forth in part in my opinion in *State v. Walker*, 2011 UT 53, ¶¶ 27–69, 267 P.3d 210 (Lee, J., concurring), and elaborated further below.

¶37 I would hold that article I, section 14 of the Utah Constitution does not require the imposition of an exclusionary remedy for a violation of this provision. Instead I would conclude that this clause does not speak to the required remedy, but leaves that matter to be resolved and adapted by policymaking branches of government over time. In so doing I would repudiate the reasoning contained in our contrary precedents, such as *State v. Larocco*, 794 P.2d 460 (Utah 1990), and *State v. Thompson*, 810 P.2d 415 (Utah 1991). These cases are entitled to a presumption of correctness under our doctrine of *stare decisis*. *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 21–22, 345 P.3d 553. But in my view their analysis is ripe for repudiation because it is not firmly rooted in our law, is clearly incorrect as a matter of original meaning, and does not sustain significant reliance interests. *See id.* ¶ 22 (identifying factors relevant to the decision whether to overrule precedent).

I

¶38 The *Walker* case was similar to this one in several respects. The briefing in that case, as here, raised the question of whether article I, section 14 enshrines an exclusionary remedy for a violation of the state guarantee against unreasonable searches and seizures. And, as in this case, we stopped short of reaching that issue because we found probable cause sufficient to sustain the reasonableness of the search in question. *See Walker*, 2011 UT 53, ¶¶ 13–18.

¶39 In the *Walker* case I wrote separately to "articulate an alternative ground for affirmance." *Id.* ¶ 28 (Lee, J., concurring). I suggested, specifically, that "Utah's constitution as originally understood did not contemplate the remedy of exclusion in the event of an illegal search or seizure." *Id.* I presented historical evidence cited in the briefs in that case that seemed to me to undermine the notion of an exclusionary remedy as mandated by the Utah Constitution. *See id.* ¶¶ 47–58. And I advocated overruling our decisions in *State v. Larocco*, 794 P.2d 460 (1990), and *State v. Thompson*, 810 P.2d 415 (Utah 1991), on the ground that they "enshrine[d] this sweeping remedy without any consideration of the original meaning of the constitutional provision in question." *Walker*, 2011 UT 53, ¶ 28 (Lee, J., concurring). I also suggested that it was important for us to address this question soon because the *stare decisis* effect of *Larocco* and *Thompson* could become cemented over time—making it difficult for us to overturn them even if we decided they were wrongly decided. *See id.* ¶¶ 59–60 (asserting that "[w]e are not yet at the stage where the *Thompson* exclusionary rule is beyond our reconsideration," but that in time "a defendant whose section 14

rights are infringed could plausibly contend that he reasonably relied on the availability of an exclusionary rule in Utah constitutional law").

¶40 The briefing in this case has confirmed the principles set forth in my *Walker* opinion while also highlighting an aspect of the issue that I did not fully explore there. I continue to maintain that (a) "the text and history of article I, section 14" do not "incorporate the sweeping remedy of an exclusionary rule" as a requirement of state constitutional law, *id.* ¶¶ 47–58; (b) our decisions in *Larocco* and *Thompson* endorsed an exclusionary remedy without analyzing the text or history of article I, section 14, *id.* ¶¶ 40–46; and (c) "there is little ground for an argument that the [exclusionary] rule is so settled that it is beyond reconsideration on reliance grounds," *id.* ¶ 60. And for these reasons, as in *Walker*, I would urge this court to "reconsider" the idea of an exclusionary rule as a matter of state constitutional law. *Id.*

¶41 I would do so here. I would address the remedy question that was briefed and argued to us in this case and resolve it as an alternative basis for our decision.

A

¶42 In my concurrence in *Walker* I observed that the constitution "*says nothing* about an exclusionary—or any other—remedy for the violation of" article I, section 14. *Id.* ¶ 47 (emphasis added); *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶ 20, 16 P.3d 533 ("aside from the Takings Clause, there is no textual constitutional right to damages for one who suffers a constitutional tort").[20] Yet I also noted that "a citizen wronged by an illegal search" in the late nineteenth century "could sue the wrongdoers for the tort of trespass" and recover damages. *Walker*, 2011 UT 53, ¶ 49 (Lee, J., concurring). And I implied that a damages award is the remedy

---

[20] The absence of a textually prescribed remedy is not necessarily a license to abrogate any and all remedies, however. In fact our precedent holds that article I, section 14 is self-executing, *see Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 63, 250 P.3d 465, an indication that this provision "articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers" and that "no ancillary legislation is necessary" to secure access to a remedy for victims of illegal searches and seizures, *see Spackman*, 2000 UT 87, ¶ 7 (citation omitted).

contemplated by the text and history of article I, section 14 of the Utah Constitution.

¶43 The briefing in this case, however, identified grounds for skepticism of the proposition that a damages remedy is the remedy the Utah Constitution requires. Such a remedy was generally available at the time of the framing of the Utah Constitution.[21] But "[t]he absence of any textual reference to a [damages] remedy shifts the focus to the historical context of this provision." *Id.* ¶ 48.

¶44 The relevant context, in my view, includes a general premise about the law of remedies—which is that the selection and crafting of an appropriate remedy has long been thought to be the province of the common law. *See, e.g., Spackman*, 2000 UT 87, ¶¶ 20–21, 24–25 ("[A] Utah court's ability to award damages for violation of a self-executing constitutional provision rests on the common law."). Sometimes the common law is overtaken by the legislature, through the legislative prescription of a remedy. *See, e.g., Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶¶ 16–17, 203 P.3d 962 (noting that the Workers Compensation Act creates a remedial scheme "[i]n place of common law remedies"). That is the legislature's prerogative. But the general point is that the law of remedies has long been understood to be subject to adaptation and evolution over time. Because the constitution does not speak to the remedy for an unreasonable search or seizure, moreover, it seems sensible to read article I, section 14 as requiring a remedy sufficient to protect the rights of Utah citizens but leaving the selection of the appropriate remedy—or remedies—up to common-law evolution. *Cf. Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985) ("[N]either the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies as of the time of statehood.").

¶45 The remedy of exclusion was introduced into our Utah system as a matter of federal constitutional law by *Mapp v. Ohio*, 367

---

[21] *See* Jeremy M. Christiansen, *State Search and Seizure: The Original Meaning*, 38 U. HAW. L. REV. 63, 78–99 (2016) (citing "a substantial body of search and seizure, tort-driven case law . . . across the country from the early 1800s through the early 1900s" and concluding that there was "little or no controversy about this regime being the way in which the right against unreasonable searches and seizures was enforced").

U.S. 643 (1961). Thereafter we have accepted that remedy as one appropriate to redress violations of the state constitution.

¶46 But that premise is ripe for reconsideration. If the Utah Constitution does not speak to the appropriate remedy, but leaves that question up to the common law (or legislative adjustment), then we should open the door to adaptation of the remedy or remedies available for unreasonable searches or seizures. By improperly constitutionalizing the exclusionary rule, this court has cut off the ability of policymakers, including this court, from evaluating and developing effective and innovative remedies.

B

¶47 I would open that door here. As an alternative basis for reversal, I would interpret the Utah Constitution to prohibit unreasonable searches and seizures but to leave open the question of the appropriate remedy.

¶48 Under this approach, we would accept the existing framework of an exclusionary rule (subject to exceptions) *as a matter of common law*. But we would clarify that this remedy is not a constitutional mandate. And that regime would leave the door open to ongoing adjustment by this court or the legislature going forward. *See Spackman*, 2000 UT 87, ¶ 24 ("In general, the legislative branch has the authority, and in many cases is better suited, to establish appropriate remedies for individual injuries," so the courts should "use their common law remedial power cautiously"). This would allow policymakers to determine whether the exclusionary rule is the most effective remedy to protect the rights of Utah citizens.

¶49 A move in that direction could address concerns about the current state of search and seizure law. There is an irony in our modern search and seizure law: Because the sole remedy for an unlawful search or seizure is exclusion of evidence, the protections of the constitution are reserved for those found in possession of illegal contraband; the purely innocent are left without an effective remedy.[22]

---

[22] *See, e.g., Bivens v. Six Unknown Named Agents of Fed. Bureau of Investigations*, 403 U.S. 388, 411–424 (1971) (Burger, C.J., dissenting) (observing that the rule "protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches") (citation omitted); *Terry v. Ohio*, 392 U.S. 1, 14 (1968) ("Regardless of how

(Continued)

¶50 There is a further downside to the exclusionary rule: It imposes societal costs unnecessary to the goal of remedying the effects of the unlawful search. Those disproportionate external costs distort the law of search and seizure in ways that further undermine its full protection.[23] And this problem has led to a patchwork of exceptions to the exclusionary rule—exceptions that are often ill-defined and difficult to predict,[24] and that effectively remove the

effective the rule may be where obtaining convictions is an important objective of the police, it is powerless to deter invasions of constitutionally guaranteed rights where the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal." (footnote omitted)).

[23] *See, e.g.,* Samuel Estreicher & Daniel P. Weick, *Opting For a Legislative Alternative to the Fourth Amendment Exclusionary Rule*, 78 UMKC L. REV. 949, 951 (2010) ("The prospect of suppression is thought to be so problematic that it acts as a negative hydraulic causing judges to distort substantive Fourth Amendment law in order to avoid this consequence."); Eugene Milhizer, *The Exclusionary Rule Lottery*, 39 U. TOL. L. REV. 755, 763 (2008) ("Deterring future police misconduct is a worthwhile goal . . . . But deterrence is far from the only value at stake, and binding the many costs of suppression exclusively to this benefit constitutes an imprudent and even immoral approach to the issue."); MALCOLM RICHARD WILKEY, ENFORCING THE FOURTH AMENDMENT BY ALTERNATIVES TO THE EXCLUSIONARY RULE 12–21 (1982) (identifying twelve specific costs of the exclusionary rule, including "the additional sheer work load" on the judiciary, "expan[sion of] the scope of search and seizure of all citizens," and "resulting diminished respect for the judicial process" (capitalizations changed)).

[24] *See State v. Strieff*, 2015 UT 2, ¶¶ 41–56, 357 P.3d 532 (pointing out that the attenuation exception and inevitable discovery exception dictated different outcomes in that case and concluding that the attenuation doctrine did not apply, while observing that "[t]he terms and conditions of the exclusionary rule have been meted out by the Supreme Court in a piecemeal . . . fashion," and that "[t]his case implicates a gap of substantial significance"), *rev'd*, 136 S. Ct. 2056 (2016) (applying the attenuation doctrine); Lynn Adelman & Jon Deitrich, *Saying What the Law Is: How Certain Legal Doctrines Impede the Development of Constitutional Law and What Courts Can Do About It*, 2 FED. CTS. L. REV. 87, 88–90 (2007) (discussing the "good faith" exception).

protections supposedly guaranteed by our federal and state constitutions.

¶51 The approach suggested here could avoid these problems. A remedial regime that includes a damages award would have the important virtue of extending protection against unreasonable search and seizure to all members of the public, not just those found in possession of illegal contraband. And it would allow us to reform a body of law that is riddled by a set of contradictory exceptions that contribute more confusion than clarity.

¶52 The exclusionary rule is both under- and over-inclusive. Its under-inclusiveness lies in its failure to provide a remedy for any but those who are found in possession of contraband. Its over-inclusiveness is in affording relief that goes well beyond that necessary to restore an injured party to his "rightful position"—the position he would have been in but for the infringement of his constitutional rights. Both features are troubling. The former means that some of our citizens have no effective means of securing their right against unreasonable search and seizure. And the latter is also troubling, because the exclusionary rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis v. United States*, 564 U.S. 229, 237 (2011). In fact, "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.*

¶53 We can avoid these problems by returning to first principles. The constitution is not an omnibus repository of answers to society's most difficult problems. When we think of it in that way, we thwart policymakers' ability to exercise the flexibility necessary to make ongoing adjustments addressing complex problems.[25] That is certainly true here. By constitutionalizing a remedy not enshrined in the constitution we have interrupted the normal evolutionary

---

[25] *See* Ruth Bader Ginsburg, *Speaking in a Judicial Voice*, 67 N.Y.U. L. REV. 1185, 1208 (1992) (observing that *Roe v. Wade*, 410 U.S. 113 (1973), "halted a political process that was moving in a reform direction and thereby . . . prolonged divisiveness and deferred stable settlement of the issue"); J. Harvie Wilkinson, III, *Constitutionalization of School Discipline: An Unnecessary and Counter-Productive Solution*, 1 MICH. L. & POL'Y REV. 309, 312 (1996) ("When we take the important step of constitutionalizing a problem such as student discipline, we . . . remove it from the hands of the democratic process and place it in the lap of the federal courts.").

processes of the law—the means of judicial or legislative adaptation of the remedies available for unreasonable searches and seizures.

¶54 I would reopen the judicial and legislative dialogue on this important issue. I would conclude that the Utah Constitution does not prescribe an exclusionary remedy for an infringement of the freedom from unreasonable search and seizure. And I would thereby invite our judges and legislators to look for creative ways to correct for the under- and over-inclusiveness problems introduced by the exclusionary rule—ways to fully protect Utah citizens from illegal government intrusions.[26]

## II

¶55 My colleagues' opposition to my approach seems rooted in principles of constitutional avoidance and *stare decisis*. *See supra* ¶¶ 23–25, 31–32. I endorse both of those principles and respect my colleagues' views on how to apply them here. But I believe that established doctrines of constitutional avoidance and *stare decisis* leave ample room for the decision that I advocate.

### A

¶56 The principle of constitutional avoidance is rooted in our longstanding commitment to judicial humility. *See State v. DeJesus*, 2017 UT 22, ¶ 33, 395 P.3d 111. Our courts are reluctant to reach out to decide new questions of constitutional law because we recognize that such decisions can become fixed in relative stone: A

---

[26] *See, e.g., Bivens*, 403 U.S. at 421–24 (Burger, C.J., dissenting) ("Reasonable and effective substitutes can be formulated if Congress would take the lead . . . . I see no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some meaningful and effective remedy against unlawful conduct by government officials."); WALTER P. SIGNORELLI, THE CONSTABLE HAS BLUNDERED: THE EXCLUSIONARY RULE, CRIME, AND CORRUPTION 189–199 (2010) ("Civil rights lawsuits and criminal charges against abusive officers . . . are the strongest remedies, and they do not have the side effect of allowing dangerous criminals to escape justice."); Estreicher & Weick, *supra* ¶ 51 n.23, at 952 (proposing a system whereby the U.S. Department of Justice approves state and local government procedural safeguards for preventing unreasonable searches and seizures; no evidence procured by a certified law enforcement agency would be subject to exclusion in court).

constitutional decision is insulated from review or reconsideration by the political branches of our government.[27]

¶57 For this and other reasons our courts have long acknowledged the "gravity and delicacy" of constitutional questions. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47 (1936). And we generally decline to pass on them when another ground is available because we recognize that further percolation and analysis is likely to enhance the quality of our decisionmaking.[28]

¶58 That said, the principle of constitutional avoidance is not a hard and fast rule. It is a presumption. Courts retain the discretion to decide any and all issues presented for review.[29] And in my view the presumption of avoidance is rebutted here.[30]

---

[27] *See* Henry Paul Monaghan, *On Avoiding Avoidance, Agenda Control, and Related Matters*, 112 COLUM. L. REV. 665, 676 (2012) (noting that the courts have treated this form of avoidance as a discretionary matter of internal "governance" "designed to ameliorate the 'friction between democratic principles and judicial authority'" (citation omitted)).

[28] Justice Himonas cites other considerations in support of his conclusion that avoidance is appropriate in this case. He asserts that avoidance "forges certainty, stability, and predictability in the law" and "lays a foundation of order upon which individuals and organizations in our society can conduct themselves." *Supra* ¶ 24 (quoting *State v. Shoulderblade*, 905 P.2d 289, 292 (Utah 1995)). I certainly agree with these principles. But the quoted language is from an opinion addressing the doctrine of *stare decisis*. And the premises of that doctrine, though related to the presumption of constitutional avoidance, are somewhat different. I address them in Part II.B. below.

[29] *See* Michael L. Wells, *The "Order-of-Battle" in Constitutional Litigation*, 60 SMU L. REV. 1539, 1552 (2007) ("Despite the benefits of constitutional avoidance, it is best characterized as a flexible norm, not an absolute requirement."); Lisa A. Kloppenberg, *Avoiding Constitutional Questions*, 35 B.C. L. REV. 1003, 1028–35 (1994) (demonstrating that the U.S. Supreme Court "has used an ad hoc approach in implementing the last resort rule"); *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 574 (1947) (speaking of this principle of avoidance as a "policy" and establishing that its "applicability can be determined only by an exercise of judgment relative to the particular

(Continued)

¶59 In an ordinary case I would not tread into new constitutional territory when an alternative ground for decision is available. But this is not an ordinary case. And this is not really new constitutional territory.

¶60 Our decisions have already entered this constitutional space in establishing an exclusionary remedy for violations of the Utah search and seizure clause. Yet that precedent leaves litigants and lower courts in the dark on the practical implications of our precedent for disputed cases. The ultimate effect of the exclusionary rule is dictated by the application or availability of any of a number of "exceptions" established in the case law. *See State v. Worwood*, 2007 UT 47, ¶¶ 43–44, 164 P.3d 397 (describing the independent source, inevitable discovery, and attenuation exceptions). And our courts have not yet decided whether or to what extent to embrace the exceptions endorsed by the United States Supreme Court.

¶61 This was the key constitutional question presented in this case. The district court rejected the availability of the "good faith" exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984). And the parties addressed that question extensively in their briefing to this court.

¶62 In these circumstances I do not think that humility counsels avoidance. Our case law, as it stands, gives an incomplete answer to the question of the appropriate remedy for a violation of article I,

---

presentation, though relative also to the policy generally and to the degree in which the specific factors rendering it applicable are exemplified in the particular case").

[30] I am not advocating a "presumption against recognizing constitutional rights." *Supra* ¶ 26. Nor am I urging us to "walk back (or not recognize) constitutional rights" under article I, section 14. *See supra* ¶ 26. Quite the contrary. The operative constitutional right is to be free from unreasonable searches and seizures. The exclusionary rule is not a constitutional right. It is just one of several *remedies* that may be employed to protect the right protected by the constitution. I am proposing that we open the door to alternative remedies that may protect that right more effectively. Doing so overrides the presumption against reaching constitutional questions that are unnecessary to our decision. But I find good reasons for overcoming that presumption here—reasons that are rooted in a desire to protect the underlying constitutional right more effectively.

section 14 of the Utah Constitution. This is not constitutional territory we have left uncharted. It is territory we have mapped partially—in a manner leaving the important questions unresolved.

¶63 Justice Himonas says that there is no pressing need for us to intervene to resolve the question presented. *Supra* ¶ 29. But that misses a key impact of our decision to leave the constitutional question presented by this case only partially answered: So long as we preserve the *Larocco-Thompson* rule without addressing the availability of exceptions we are fostering uncertainty and litigation in the lower courts without the benefit of further guidance from this court.[31]

¶64 For that reason I think the usual presumption of constitutional avoidance is rebutted here. We do not advance the cause of judicial humility by painting a partial picture of the constitutional doctrine in this important field. In fact our decision to do so affirmatively undermines a core premise of the doctrine of constitutional avoidance. By leaving the exclusionary rule in place we are actively foreclosing policy judgments by the democratically elected branches of our government. We do so, moreover, without ever engaging in any careful constitutional analysis. *See State v. Walker*, 2011 UT 53, ¶ 46, 267 P.3d 210 (Lee, J., concurring) (noting that the court in *Larocco* and *Thompson* "embraced an independent state exclusionary rule . . . without ever considering the original meaning of the constitutional provision in question").

¶65 This is not humble restraint. It is a decision that may in time cement the exclusionary rule in place without any analysis of its constitutionality or elaboration of exceptions to its application. *See id.* ¶ 59 (noting that the exclusionary rule recognized in *Larocco* and *Thompson* may in time "become so ingrained in our jurisprudence that its reconsideration [will] be difficult"). And this "humble restraint" restrains both us and the legislature, in our rulemaking capacities, from innovating and adjusting the remedy to ensure that

---

[31] Justice Himonas also calls the need to revisit *Larocco* and *Thompson* "overblown" because a case that squarely presents this issue will come before us soon, or, if not, that signals a lack of "urgent workability concerns." *See supra* ¶ 29. But this does not change the fact that, because of plea agreements and other factors, lower courts are likely grappling with exclusionary rule issues much more often than our court receives cases that present these issues.

the citizens of Utah have effective and meaningful redress when their section 14 rights have been violated.

¶66 For that reason I see this as the exceptional case in which the presumption of avoidance is overcome. I would reach the constitutional question presented in this case because I think the usual premises of the presumption of avoidance cut the other way here.

B

¶67 That leaves the question whether our decisions in *Larocco* and *Thompson* are nonetheless entitled to deference as a matter of *stare decisis*. Our cases speak of "not overrul[ing] our precedents 'lightly.'" *Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 (citation omitted). We have emphasized that the doctrine of *stare decisis* promotes the stability of the law and "the public's substantial reliance interests upon an established legal principle." *Id.* ¶ 35 (citation omitted). But we have also long held that the doctrine of *stare decisis* states a "presumption," not a "binding legal rule to be blindly followed." *Id.* ¶ 22 (quoting 20 AM. JUR. 2D *Courts* § 131 (2005)). The presumption of *stare decisis* is rebuttable. And it may be rebutted where we are convinced "more good than harm will come by departing from precedent." *Utah Dep't. of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 16, 275 P.3d 208 (citation omitted).

¶68 A threshold question under the doctrine of *stare decisis* is "how firmly" a line of "precedent has become established in the law since it was handed down." *Eldridge*, 2015 UT 21, ¶ 22. In making that assessment we consider "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* We also assess "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Id.*

¶69 The point of this inquiry is to balance the important goal of maintaining stability in the law against our ongoing commitment to getting the law "right." The first-listed set of considerations is aimed at assessing the downsides of overruling precedent. If a law is working well in practice and sustains significant reliance interests, it may be costly to reform the law by overruling precedent. And that is a point favoring deference to precedent. The second consideration quoted above goes to the upside of overruling an erroneous precedent. The more clearly errant a prior decision, the greater then need to set it aside in advancing our commitment to the rule of law.

¶70 This is what our cases mean when they speak of more "good than harm" coming from overruling a prior opinion. The principal harm is in undermining stability of our law and reliance interests built around our precedent. *See Austad v. Austad*, 269 P.2d 284, 290 (Utah 1954) (explaining that the "reason underlying" *stare decisis* is "that people should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat"). Thus, the argument for overruling a prior decision is strongest when the costs of overruling (from a reliance or stability standpoint) are low and the benefits (from a rule of law standpoint) are high.[32]

¶71 And in my view that is the case here. The usual costs of overruling precedent are not implicated here because *Larocco* and *Thompson* are not deeply rooted in our law, are unworkable in practice, and do not sustain significant reliance interests.

¶72 First, *Larocco* and *Thompson* are far from deeply rooted. Those decisions ignored contrary precedent from this court—*State v. Aime*, 220 P. 704, 708 (Utah 1923) (unanimously holding that "the admissibility of evidence is not affected by the illegality of the means through which it has been obtained"), and *State v. Fair*, 353 P.2d 615, 615 (Utah 1960) (concluding that "[i]t is not necessary to determine whether or not [a] search was legal, because this court has previously held that evidence, even though illegally obtained, is

---

[32] In *Walker*, here, and elsewhere, I have embraced a doctrine of *stare decisis* that is in line with the standard set forth in this court's precedents. I do so, moreover, with the understanding that our doctrine is largely in line with the standard of *stare decisis* employed in the era of the founding. *See generally* Thomas R. Lee, *Stare Decisis in Historical Perspective: From the Founding Era to the Rehnquist Court*, 52 VAND. L. REV. 647 (1999) (concluding that most elements of our modern doctrine of *stare decisis* have been with us since the time of the founding). That seems significant, as it may allow us to reconcile the doctrine of *stare decisis* with an originalist approach to constitutional interpretation. The doctrine of *stare decisis* is a method that the framers would have used in determining the meaning of the constitution. And on that basis it seems to me a method of interpretation that aligns with originalism. *See generally* John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751 (2009).

admissible"). In jettisoning this precedent, moreover, our opinions in *Larocco* (a plurality) and *Thompson* (a majority) "made no reference to the text, history, or original meaning" of article I, section 14 of the Utah Constitution.[33] *Walker*, 2011 UT 53, ¶ 42 (Lee, J., concurring). Instead they simply "deemed it 'useful to examine opinions from other state courts'—opinions indicating a trend of '[a]t least eighteen states' that had 'adopted an independent state constitutional exclusionary rule.'" *Id.* (alteration in original) (citation omitted).

¶73 Thus, our precedents adopting a Utah exclusionary rule did not engage in independent constitutional analysis. We were "simply jumping on what [we] perceived as the state exclusionary rule bandwagon." *Id.* ¶ 43. And this substantially reduces the downsides of repudiating these decisions. The costs of overruling precedent are diminished where the precedent in question "abandon[ed] [a] long established" rule and "failed to cite [a previous] line of cases altogether." *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994), *superseded in part by constitutional amendment as recognized in State v. Goins*, 2017 UT 61, __ P.3d __. That is precisely what *Larocco* and *Thompson* did. And that renders them ripe for reconsideration.

¶74 This is not the only basis for concluding that *Larocco* and *Thompson* are vulnerable under our doctrine of *stare decisis*. A second consideration is the undeveloped state of our law in this field. We have not had occasion to decide whether and to what extent to adopt exceptions to the exclusionary rule—exceptions like those embraced by the United States Supreme Court in a long line of decisions in the past few decades.[34] Again this was a key point of dispute in this case. The district court declined to embrace a "good faith" exception to the Utah exclusionary rule like that established in federal law in *United*

---

[33] My point is not that *Thompson* failed to "recogniz[e] that *Larocco* was not binding precedent." *Supra* ¶ 32 n.19. It is that *Thompson* advanced no independent analysis. And that neither *Larocco* nor *Thompson* offered any textual or historical basis for the adoption of an exclusionary rule.

[34] *See Herring v. United States*, 555 U.S. 135, 137 (2009) (evidence admitted when an unconstitutional search was "the result of isolated negligence attenuated from the arrest"); *Illinois v. Frull*, 480 U.S. 340, 359–60 (1987) (no exclusion when officers performed a search in reliance on a statute later declared unconstitutional); *Nix v. Williams*, 467 U.S. 431, 443 (1984) (exclusion not warranted when the "challenged evidence has an independent source").

*Leon*, 468 U.S. at 897. And the briefing on appeal argued at some length about whether that decision was appropriate as a matter of state constitutional law.

¶75 This is the key question of state constitutional law in this field. There is no evidentiary exclusion if the exclusionary rule is overridden by an exception. And this court has not yet decided that question. Unless and until we do so there can be no significant reliance interests on the general adoption of an exclusionary rule in *Larocco* and *Thompson*. "Because the dimensions and scope of the Utah exclusionary rule have not yet been established, there is little ground for an argument that the rule is so settled that it is beyond reconsideration on reliance grounds." *Walker*, 2011 UT 53, ¶ 60 (Lee, J., concurring).

¶76 For these reasons I see little downside to our reconsideration of the exclusionary rule embraced in *Larocco* and *Thompson*. I would therefore proceed to consider "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Eldridge*, 2015 UT 21, ¶ 22. And for reasons set forth in detail above I would conclude that these decisions are ripe for repudiation.

---