2018 UT App 63

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MELAINE NICOLE MATHESON,
Appellant.

Opinion
No. 20160162-CA
Filed April 12, 2018

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 131501261

Gary W. Pendleton, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1     With our permission, granted in accordance with rule 5 of
the Utah Rules of Appellate Procedure, Appellant Melaine
Nicole Matheson (Defendant) appeals an interlocutory order of
the district court denying her motion to suppress the evidence
against her. We affirm.

BACKGROUND

¶2     An experienced narcotics officer presented an affidavit in
support of a warrant to search a residence in St. George for

specified drug-related evidence. In addition, the affidavit sought authority to search "[a]ll persons" and "[a]ll vehicles present at the time of execution" of the warrant, as well as authority to search two specifically named individuals. Defendant was one of these two individuals.

¶3    In his affidavit, the officer identified several grounds for believing that a search would uncover the evidence he described. To begin with, he explained that the Washington County Drug Task Force had received information that the target home was "being used as a drug stash house." He also stated that Task Force officers had "observed a consistent amount of short term traffic" in and out of the home "during the evening hours" and that drug paraphernalia—syringes, a meth pipe, and several marijuana pipes—had been discovered during a recent search of garbage left curbside for pickup. He noted that the meth pipe had tested positive for methamphetamine. He then explained that Task Force officers had recently made a traffic stop after observing a car leave the target residence, that the officers had found suspected methamphetamine and drug paraphernalia in the vehicle, and that both occupants had admitted to having just left the residence. The vehicle's occupants had also informed the officers that a man named "Dino" resided at the home and that a woman named "Melaine" was often there as well.

¶4    The officer's affidavit recited that, after further investigation, the Task Force had identified "Dino" and "Melaine" as Dean Carrell and Defendant. Upon checking utility records for the residence, officers discovered an active account in Carrell's name, and while surveilling the residence, they observed Carrell "coming and going freely." Carrell had been arrested "several times for distribution of illicit narcotics." As for Defendant, Task Force officers observed her at the residence "on several different occasions." They also learned from

"[c]onfidential sources" that she had been "distributing a large amount of illicit narcotics into [the] community."[1]

¶5 Based on the officer's affidavit, a district court judge, acting as a magistrate, issued a warrant (the First Warrant) authorizing Task Force officers to search the target residence, "the person(s) of" Dean Carrell and Defendant, and "[a]ll persons" and "[a]ll vehicles present at the time of execution."

¶6 Four days after the First Warrant was issued, while an entry team prepared to execute the warrant on the target residence, two detectives conducted surveillance in an unmarked police vehicle approximately 100 yards from the residence. Before the entry team arrived, the two detectives spotted Defendant leaving the residence and watched as she stepped into a red Mazda pickup truck and drove off. After alerting the entry team, the detectives followed Defendant for about four blocks before signaling her to pull over.

¶7 One of the detectives detained Defendant and placed her in his vehicle after informing her of the First Warrant. He then proceeded to drive Defendant to the police station, which was no more than three or four blocks away from where they had stopped her, while the other detective followed in Defendant's truck. The first detective later testified that his decision to

---

1. Although the officer did not outline specific information about the "[c]onfidential sources," his routine exposure to multiple potential sources was outlined in a general way. He explained that over the course of his three years with the Task Force he had "conducted hundreds of interviews with gang members," been "the case officer on several drug arrests," "executed several search warrants where substantial amounts of narcotics have been seized," and "interviewed several persons in the drug culture and gained information . . . directly from them."

remove Defendant from the area was predicated on his fear that she might "call someone or notify someone at the residence that she was being detained." Such an eventuality, he explained, would compromise "the safety of the entry team."

¶8     When they arrived at the police station, the first detective immediately conducted a search of Defendant's person. He found a bag of marijuana in one pocket and a bag of methamphetamine in another. The detective then asked Defendant for permission to search her vehicle. She replied, "Not without a warrant."

¶9     The detective retrieved a dog to perform a drug sniff of Defendant's truck, now parked at the station, and the dog alerted him to the presence of a controlled substance in the area of the driver's side door. Based on the evidence found on Defendant's person and the dog's alert, the detective sought and obtained a warrant to search the truck (the Second Warrant). Upon executing it, the detectives "located a significant amount of drugs and paraphernalia," as well as a firearm.

¶10     The State charged Defendant with possession of methamphetamine with intent to distribute, a first degree felony; possession of marijuana, a third degree felony; possession of a dangerous weapon by a restricted person, a third degree felony; and possession of drug paraphernalia, a class A misdemeanor. Defendant moved to quash both warrants and to suppress all evidence discovered under color of their authority, arguing that the searches exceeded the warrants' grant of authority and that the warrants were not supported by probable cause. Unpersuaded, the district court denied the motion in a detailed, nine-page order. This appeal followed.

ISSUE AND STANDARD OF REVIEW

¶11   Defendant ascribes error to the district court's decision denying her motion to suppress. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. Under this standard, "[w]hile the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.*

ANALYSIS

¶12   Defendant challenges the district court's denial of her suppression motion on four grounds. First, she maintains that the evidence contained in the affidavit submitted in support of the First Warrant was insufficient to establish probable cause justifying "a search of [her] person independent of the search of the target location." Second, she argues that even if the evidence contained in the affidavit might have justified a broader grant of authority, as written the First Warrant did not authorize officers to conduct a search of her person at any location other than the target residence. Third, Defendant argues that neither the transport of her truck to the police station nor its subsequent search at the station was authorized under the First Warrant.[2] And fourth, Defendant maintains that the search of her truck was not authorized under the Second Warrant because it was obtained on the basis of evidence uncovered "through the

---

2. Defendant also argues that the detectives had no grounds to effect a *warrantless* seizure of the truck. However, our conclusion that the detectives lawfully seized the truck under the authority conferred on them by the First Warrant, *see infra* Section III, carries with it the necessary conclusion that the seizure was not warrantless. We therefore do not address this argument further.

exploitation of the illegal seizure of [her] person and her vehicle."

## I. The Officer's Affidavit

¶13 Defendant argues that "the affidavit supporting the issuance of [the First Warrant] does not establish probable cause to believe that, if . . . Defendant were located and subjected to search at some location other than the target residence, she would be found in possession of a contraband substance." In support, she asserts that the officer's affidavit "provides absolutely no way of evaluating the credibility or reliability of" his information regarding her distribution of drugs into the community because the identity of his confidential sources is undisclosed, and there is no indication that the unnamed sources "claimed to have personal knowledge." Rather, she maintains, the "only information" related to Defendant "that was corroborated on any level involved her somewhat casual relationship to the target residence." Taking the totality of the circumstances into account, we conclude that the information in the affidavit established probable cause to believe that contraband could be found on Defendant's person regardless of where she was searched.

¶14 Consistent with the jurisprudence of the United States Supreme Court, the Utah Supreme Court has stated that when reviewing the issuance of a search warrant, "the issue is whether the magistrate had a substantial basis to conclude that in the totality of the circumstances, the affidavit adequately established probable cause." *State v. Hansen*, 732 P.2d 127, 129 (Utah 1987) (per curiam). *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Under the totality-of-the-circumstances approach, "[s]earch warrant affidavits are to be construed in a common-sense, reasonable manner," and "excessive technical dissection of an informant's tip . . . is ill-suited to this task." *Hansen*, 732 P.2d at 130. *Accord State v. Rowan*, 2017 UT 88, ¶ 16 ("We afford the magistrate's

decision great deference and consider the affidavit relied upon by the magistrate in its entirety and in a common sense fashion.") (brackets, citation, and internal quotation marks omitted). While "an informant's reliability and basis of knowledge" are relevant considerations, "[a] weakness in one or the other is not fatal to the warrant." *Hansen*, 732 P.2d at 130 (citation and internal quotation marks omitted). We instead look to the affidavit in its entirety for indications of "veracity, reliability, and basis of knowledge," which are "nonexclusive elements to be evaluated in reaching the practical, common-sense decision whether, given all the circumstances, there is a fair probability that the contraband will be found in the place described." *Id. See Rowan*, 2017 UT 88, ¶ 16.

¶15   Applying this standard to the affidavit before us, we conclude that probable cause existed to believe that Defendant would likely be found in possession of contraband regardless of her location. It is true that the officer did not disclose in his affidavit the identity of the confidential sources who tipped him off to the fact that Defendant "ha[d] been distributing a large amount of illicit narcotics into [the] community," nor did he identify the basis of their knowledge. Admittedly, then, the confidential sources' credibility was not directly established by the officer, and their information was not necessarily reliable. But when applying the totality-of-the-circumstances test, the credibility and reliability of informants' tips "are but two relevant considerations, among others, in determining the existence of probable cause." *See Hansen*, 732 P.2d at 130.

¶16   When considering the affidavit in its entirety, its relative weaknesses are offset by the fact that the officer identified other reliable information connecting Defendant to the drug-related activities apparently taking place at the target residence. In our view, Task Force officers had sufficient information to establish probable cause for believing that illegal drugs were being distributed at the residence. Significant amounts of drug

paraphernalia were discovered in the trash outside the home, and officers witnessed an unusual "amount of short term traffic during the evening hours." Task Force officers also discovered illegal drugs in a vehicle that they pulled over immediately after it had left the residence.

¶17    Given these facts, any reliable information that linked Defendant to the target residence would naturally buttress the reliability of the confidential sources' otherwise dubitable information. And indeed, the officer's affidavit did contain such information. For instance, after Task Force officers found illegal drugs in the vehicle that had just departed from the residence, the vehicle's occupants identified Defendant by name and informed the officers that she "frequented the residence." Further, upon conducting surveillance of the home, Task Force officers themselves observed Defendant entering and exiting on several occasions.

¶18    Of course, one might object that citing the reliability of one source in an effort to enhance the reliability of another is problematic where the information provided by the two sources is not identical, or where neither source's information is conclusive on its own. And indeed, it must be acknowledged that, while the confidential sources claimed that Defendant was personally engaged in the distribution of narcotics, the information provided by the driver and passenger, as well as the officer's surveillance observations, solidified Defendant's connection to the residence where drug-related activity appeared to be taking place without directly pointing to Defendant's personal involvement. But such "[e]xcessive technical dissection" is "ill-suited" to the task before us. *See Hansen*, 732 P.2d at 130. Because a probable cause determination involves a "practical, common-sense decision," *id.*, the totality of the information Task Force officers accumulated meaningfully bolstered the credibility of the confidential sources.

¶19 Accordingly, upon considering the totality of the circumstances, we conclude that the reliability of the confidential sources' tip was enhanced in light of the other information contained in the officer's affidavit. We are therefore persuaded that probable cause existed to believe Defendant would likely be in possession of illegal drugs or paraphernalia.

## II. The Scope of the First Warrant

¶20 Defendant next maintains that, as written, the First Warrant did not authorize the detectives to carry out a search of her person at any location other than the target home. In support of her argument, Defendant cites two cases from the Court of Appeals of New York, *People v. Green*, 310 N.E.2d 533 (N.Y. 1974), and *People v. Kerrigan*, 374 N.Y.S.2d 22 (App. Div. 1975). Neither is binding on us, and both are distinguishable.

¶21 The court in *Green* determined that a search warrant was not "a personal warrant that could be executed anywhere" because its language was "directed to a designated place and only incidentally authorized the search of any person 'found therein.'" 310 N.E.2d at 534. In that case, the criminal activity described in the police officer's affidavit had been limited to a single apartment, and the affiant had identified the individual named in the warrant—"Vino"—simply as the apartment's "occup[ant]." *Id.* When rendering its decision, the court emphasized that "the search authority requested and granted was limited to the premises where the contraband was believed to be . . . and extended only to those individuals, . . . who being found therein, might reasonably be expected to conceal the contraband on their persons." *Id.*

¶22 Likewise, in *Kerrigan*, the court held that a search warrant "was not 'personal'" in nature because it was directed "to [a] shop as a center of gambling operations, and to defendant only had [he] been found therein." 374 N.Y.S.2d at 23–24. The court

explained that, aside from an ambiguous statement overheard by the police during a telephone conversation, the supporting affidavit described "nothing even remotely connecting defendant with gambling, as distinguished from [his] connection with the shop itself." *Id.* at 24. Thus, the court concluded, the warrant's "concern was with the shop and the operations in and around it." *Id.* at 23.

¶23    Here, the First Warrant and its supporting affidavit were not restricted in their focus to the target residence. The warrant itself specifically identified Defendant and Carrell, individually and by name, without giving any indication that the authority to search them was limited to their being found at the target residence. On the contrary, the warrant identified three primary search targets: the residence, Dean Carrell, and Defendant. Unlike the individual identified in the warrant in *Green*, Defendant is not identified as a resident of the home, nor is she even identified as someone likely to be found inside it at any particular time. Similarly, as we discussed in the previous section, the affidavit submitted in support of the warrant recites that Defendant's involvement with drug dealing extends beyond her frequent presence at the residence, and thus the officer's affidavit recounted his information that Defendant had been "distributing a large amount of illicit narcotics into [the] community."

¶24    Thus, we conclude that the warrant was, to the extent directed at Defendant, "personal in nature." *See id.* (internal quotation marks omitted). We therefore conclude that the execution of the First Warrant on Defendant was not conditioned on finding her at the target residence.[3]

_____

3. Anticipating a fallback argument from the State, Defendant also maintains that the detectives' search was not authorized under the First Warrant's language permitting officers to search

(continued…)

III. The Seizure of the Truck

¶25 Defendant also argues that, "[e]ven if [the First Warrant] is properly read to authorize a search of [her] person wherever she could be found, it did not authorize the search or the seizure of her Mazda pickup truck." We conclude that, on the contrary, the First Warrant authorized the detectives to seize the truck and transport it the short distance to the police station to be searched.[4]

¶26 Under the warrant, Task Force officers had the authority to search "[a]ll vehicles present at the time of execution." Defendant does not maintain that this grant of authority was unsupported by probable cause. Rather, she argues that this language could not have authorized the search of her truck at the time of the stop, much less later at the police station, because the stop was not made "at the time of," nor was the vehicle "present at," the warrant's execution on the target residence. After all, she argues, the entry team had not yet arrived at the target home when the detectives pulled her over, and the stop took place roughly four blocks away from the home. We reject this argument. Given what we have already concluded, the

_____

(…continued)
"[a]ll persons present at the time of execution." Because we conclude that the search of Defendant's person was permissible given that she was specifically named in the warrant, we need not further address this argument.

4. Because we conclude that the detectives' probable cause to seize Defendant's truck arose from the facts alleged in the First Warrant's supporting affidavit, we have no need to address Defendant's additional argument that probable cause to search the truck did not arise simply from the discovery of illegal drugs on her person.

truck's temporal and geographic proximity to execution of the warrant *at the residence* is irrelevant. The truck was a "vehicle[] present at the time of execution" of the warrant *on Defendant*—another of the warrant's primary targets.

¶27    We concluded above that the officer's affidavit alleged facts sufficient to establish the requisite probable cause for the First Warrant. We further concluded that the First Warrant was "personal" to Defendant, meaning that, in addition to authorizing Task Force officers to search any and all persons present at the target residence, it also authorized them to search Defendant anywhere she might be found. It therefore follows that, when the detectives stopped Defendant while she was in her truck, they were executing the First Warrant, even if they were not accompanying the entry team to the target residence. For this reason, we conclude that the truck was properly searchable as a "vehicle[] present at the time of the execution" of the First Warrant on Defendant.

¶28    And given our conclusion that the First Warrant lawfully authorized the detectives to search the truck at the time of the stop, we further conclude that they had the authority to transport it to the police station to be searched later. The Utah Supreme Court has explained that "where officers have probable cause to search an automobile and seize evidence of a crime, they have the permissible alternative to seize the vehicle, take it to the police station and search it there." *State v. Ballenberger*, 652 P.2d 927, 930 (Utah 1982). Because the detectives could have lawfully searched the car at the time of the stop pursuant to the First Warrant, they had "the permissible alternative" to seize it for a later search at the police station.

### IV. The Second Warrant

¶29    Finally, Defendant argues that the Second Warrant "must be quashed because it was clearly obtained through the exploitation of the illegal seizure of . . . Defendant's person and

her vehicle and their unauthorized transportation to the . . . police station." Given our conclusions above and the thrust of Defendant's argument, we have no need to address the validity of the Second Warrant.

¶30    In the previous sections, we concluded that the detectives were authorized under the First Warrant to search Defendant's truck and that they were entitled to transport it to the police station to effect the search there. The detectives were thus not required to obtain the Second Warrant prior to searching Defendant's truck, although erring on the side of adherence to the Fourth Amendment was surely the more prudent way to proceed.

## CONCLUSION

¶31    We conclude that the district court did not err in denying Defendant's motion to suppress the State's evidence against Defendant, as her Fourth Amendment rights were not violated. We therefore affirm the denial of her suppression motion.

——————