*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 46**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

LONNIE NORTON,
*Petitioner.*

No. 20180514
Heard May 13, 2019
Filed July 13, 2020

On Certiorari to the Utah Court of Appeals

Third District, West Jordan
The Honorable Bruce C. Lubeck
No. 131400015

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Solic. Gen., Salt Lake City, for respondent

Lori J. Seppi, Salt Lake City, for petitioner

JUSTICE PETERSEN authored the opinion of the Court with respect
to Parts I–IV in which CHIEF JUSTICE DURRANT,
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, and
JUSTICE PEARCE joined, and wrote separately in Part V in which
ASSOCIATE CHIEF JUSTICE LEE joined.

CHIEF JUSTICE DURRANT filed an opinion concurring in part and
concurring in the judgment, in which JUSTICE HIMONAS and
JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1   A jury convicted Lonnie Norton of breaking into the home where his estranged wife was staying, kidnapping her, assaulting her, and then raping her—all while she had a protective order against him. He appealed his convictions and the court of appeals affirmed. He petitions this court for a review of each claim he raised before the court of appeals. We affirm on all but one issue.

## BACKGROUND[1]

¶2   Norton and H.N. had been married for twenty-one years when H.N. moved out of the marital home with their four children. She stayed in a domestic violence shelter, then moved into her parents' home. She obtained a protective order against Norton, which prohibited him from contacting her except to discuss marriage counseling and their children. The protective order permitted Norton to visit his three younger children, but only if a supervisor was present.

¶3   One evening, H.N.'s three youngest children went to the marital home for a weekend visitation with Norton. The events of that night led to Norton's arrest.

¶4   At the trial on the resulting charges, both H.N. and Norton testified. They gave vastly different accounts of what happened that night.

*The Two Conflicting Accounts*

H.N.'s Account

¶5   At trial, H.N. testified that before going to bed that night, she put chairs under the doorknobs of the front and back doors of her parents' home, as she did each night. She had previously placed a dryer in front of the basement door, which remained there. After H.N. went to bed, she was awakened by a "loud bang." She grabbed the phone and dialed 911 before noticing Norton standing at the end of her bed. He grabbed the phone and

---

[1] "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citation omitted). "We present conflicting evidence only as necessary to understand issues raised on appeal." *Id.*

punched her in the face. Norton also wound duct tape around H.N.'s head, covering her mouth.

¶6 The next thing H.N. remembered was sitting in Norton's car at an intersection. Although it was snowing, she did not have any shoes on. H.N. noticed that Norton had a gun in his lap, which he picked up and pointed at her. H.N. thought Norton was driving to his office at the University of Utah, but instead he drove to a building in Fort Douglas. When they arrived, Norton was still holding the gun and told H.N. that she "needed to be quiet or he would shoot [her]."

¶7 H.N. and Norton went into the building, up some stairs, and into a bathroom. Norton ripped the duct tape off H.N.'s head and talked to her about reconciling their marriage. After he finished talking, Norton told H.N. to take off her shirt. When H.N. said "no," Norton pointed the gun at her and again told her to take off her shirt. She finally acquiesced, and Norton squeezed her breasts.

¶8 Next, Norton led H.N. into an office and told her to take off her pants. She again said "no," and he again pointed the gun at her, forcing her to comply. While she did so, Norton undressed, removed the magazine from the gun, and put the magazine and gun in a filing cabinet. Then, he told H.N. that they were going to have sex. She said "no," but Norton responded that "yes" they were. "So you're going to rape me?" she asked. Norton replied, "You can't rape somebody that you're married to."

¶9 He then lay on the ground and pulled H.N. on top of him. He grabbed H.N.'s hands, flipped her so that she was underneath him, and raped her. While Norton was on top of her, H.N. grabbed his penis as hard as she could, but was unsure how hard that was because she has rheumatoid arthritis. In response, Norton again grabbed her hands and held them over her head.

¶10 After raping H.N., Norton took her into the bathroom. He told her to rinse off, but she struggled because her hands were shaking. Norton complained that she "wasn't doing a good enough job," and inserted his fingers into H.N.'s vagina to try to "rinse himself out" of her. Afterwards, H.N. dried herself off with paper towels and dressed. She then noticed that Norton was dressed with the gun in his hand.

¶11 Back in the office, Norton set up two chairs so that they were facing each other and told H.N. to sit. She sat, and Norton put the gun to his head and threatened to kill himself. H.N. tried to dissuade him, but Norton pointed the gun at H.N. and threatened to shoot her, too. Eventually H.N. got mad and told

Norton to "go ahead and shoot himself," at which point he got up and took her back to the car.

¶12   Norton drove to the marital home. There, H.N. checked on the children and then convinced Norton to take her back to her parents' home. When they arrived, Norton entered the house, leaving only after H.N. told him she would not tell anyone what had happened.

¶13   After Norton left, H.N. called one of Norton's neighbors and asked the neighbor to get her children out of the marital home. H.N. also called 911, told a police officer what happened, and asked the officer to check on her children. The police arrived at H.N.'s parents' home, spoke with her, and then drove her to the hospital.

Norton's Account

¶14   Norton testified at trial and gave a very different version of these events. He claimed that H.N. told him to visit her over the weekend so they could discuss their marriage. After their children were asleep, Norton drove to H.N.'s parents' house to see her. While driving over, he received a phone call from H.N., which he missed. He arrived at H.N.'s parents' home and waited outside until she exited the house and got in the car. Norton said he could not remember whether H.N. was wearing shoes, but that "she might have come running out in stocking feet" and he thought he "gave her a pair of Reeboks to wear."

¶15   H.N. suggested they go to Norton's office to talk. While driving, Norton decided it would be better to go to a building in the Fort Douglas area.

¶16   After arriving at the building, Norton unlocked the door and proceeded upstairs with H.N. where they sat down and talked about reconciliation. H.N. said she needed time, and Norton started talking about when they first met and when they were first married. H.N. then came over, sat on Norton's lap, put her arms around him, and the two started kissing. They moved to the floor where they continued to kiss and touch each other. They took off their clothes, continued to kiss, and then H.N. "climbed on top" of Norton and they began "to have sex." Afterwards, they went into the bathroom where H.N. "rinsed" and "dried herself off."

¶17   After dressing, Norton and H.N. sat down and continued to discuss reconciliation. H.N. told Norton she did not want to live with him anymore. He replied that if they were not going to reconcile he thought it "would be fair" if they had joint custody of

their children. The two argued, and H.N. slapped Norton and then he backhanded her. H.N. tried to hit Norton more, but he grabbed her hands and the two "rastled." H.N. went into the bathroom, shut the door, and stayed there for about ten minutes. When H.N. left the bathroom, they went back to the car and she told Norton she wanted to look in on their children.

¶18 Norton drove to the marital home and they checked on the children. He then took H.N. back to her parents' home. When they got there, H.N. told Norton that the door was locked, so he pushed through a locked gate and went to one of the back doors and pushed it open. He went inside and opened a different door to let H.N. into the home. Then, he again brought up having joint custody of their children. This started another argument. H.N. then claimed that he had broken into her parents' home and beaten her up, and she threatened to call the police. Norton got scared and left. Later that morning, the police came and arrested him.

*District Court Proceedings*

Jury Instructions

¶19 The State charged Norton with aggravated kidnapping, aggravated burglary, aggravated assault, violation of a protective order, damage to or interruption of a communication device, and three counts of aggravated sexual assault. The three aggravated sexual assault charges were based on Norton squeezing H.N.'s breasts, raping her, and inserting his fingers into her vagina, respectively. The case proceeded to trial. When it came time to instruct the jury, Norton asked the court for instructions on a number of lesser included offenses. The court agreed to some of these instructions but denied others.

Verdict

¶20 On the charge of violation of a protective order and the two charges of aggravated sexual assault relating to rape and digital penetration, the jury found Norton guilty as charged. On the aggravated kidnapping, aggravated burglary, and aggravated assault charges, the jury found Norton guilty of the lesser included offenses of kidnapping, burglary, and assault. The jury acquitted him of interruption of a communication device and aggravated sexual assault related to squeezing H.N.'s breasts.

Sentencing

¶21 At sentencing, the most serious punishment Norton faced was for his two convictions of aggravated sexual assault. He made two arguments to persuade the district court to reject the

presumptive punishment tier of fifteen years to life in favor of a lower punishment tier.[2]

¶22 First, Norton argued that the district court should not apply the higher sentencing tier applicable to aggravated sexual assault based on rape and forcible sexual abuse because the jury had not been given a special verdict form to indicate the type of sexual assault upon which they relied. Norton observed that the court had instructed the jury that sexual assault could be based on rape, attempted rape, forcible sexual abuse, or attempted forcible sexual abuse. But the court did not provide the jury with a special verdict form to indicate which underlying sexual assault offense formed the basis of either conviction.

¶23 In light of this, Norton argued there was no evidence these convictions were based on anything more than the least serious offense of attempted forcible sexual abuse. So he reasoned the district court could sentence him only to six years to life, the sentencing range corresponding to aggravated sexual assault based on attempted forcible sexual abuse. UTAH CODE § 76-5-405(2)(c)(i). The court rejected this argument and concluded the presumptive range for the two counts of aggravated sexual assault should be fifteen years to life, the tier corresponding to aggravated sexual assault based on completed acts of rape and forcible sexual abuse. *Id.* §§ 76-5-405(2)(a)(i), -405(2)(b)(i).

¶24 Second, Norton argued that the district court should depart from the higher sentencing tier in the "interests of justice" due to his history, distressed state at the time of the crime, and commitment to improving. The State countered that fifteen years to life was an appropriate sentence because Norton committed "a terrible crime" and had never accepted responsibility for his actions. The court acknowledged that this was a "very difficult case" and that Norton had a "good past" and might be "entitled to some mercy." However, the court noted Norton's "inability and unwillingness to follow the truth" and that his actions were the

---

[2] The statutory sentencing range for aggravated sexual assault varies based on the type of sexual assault involved in the offense. If the underlying offense is rape or forcible sexual abuse, the presumptive sentence is fifteen years to life. UTAH CODE § 76-5-405(2)(a)(i). If the underlying offense is attempted rape, the presumptive sentence is ten years to life. *Id.* § 76-5-405(2)(b)(i). And if the underlying offense is attempted forcible sexual abuse, the presumptive sentence is six years to life. *Id.* § 76-5-405(2)(c)(i).

"kind of conduct that simply cannot be accepted in our society." The court sentenced Norton to fifteen years to life in prison on both counts of aggravated sexual assault, to run concurrently.

¶25 In total, the district court sentenced Norton to fifteen years to life in prison on both aggravated sexual assault convictions, one to fifteen years in prison for kidnapping, one to fifteen years in prison for burglary, 180 days for assault, and 365 days for violation of a protective order. The court ran each prison term concurrently.

*Court of Appeals' Decision*

¶26 Norton appealed, making five claims. Two of Norton's claims centered on the district court's jury instructions. He argued that the instructions on aggravated sexual assault and the underlying offenses of rape and forcible sexual abuse misstated the law because they did not make clear that Norton had to act intentionally or knowingly with regard to H.N.'s nonconsent. *State v. Norton*, 2018 UT App 82, ¶¶ 25, 28, 427 P.3d 312. He also argued that the district court erred in rejecting some of his requests for instructions on lesser included offenses. *Id.* ¶ 26.

¶27 Norton also challenged his sentence. He argued that the district court's decision to apply the fifteen-to-life sentencing tier for his aggravated sexual assault convictions "violated his rights to due process and a jury trial" because the jury had not been given a special verdict form to indicate the type of sexual assault forming the basis of these convictions. *Id.* ¶ 57. He reasoned that this "impermissibly increased the penalty he would have received had he been sentenced according to the facts that he claims were reflected in the jury's verdict." *Id.* ¶ 59. He also argued that the court abused its discretion when it failed to properly conduct the interests of justice analysis required by *LeBeau v. State*, 2014 UT 39, 337 P.3d 254. *Norton*, 2018 UT App 82, ¶ 67.

¶28 Finally, Norton argued that the court of appeals should reverse his convictions under the cumulative error doctrine. *Id.* ¶ 87.

¶29 The court of appeals rejected each argument. First, the court concluded that even if the jury instructions regarding aggravated sexual assault, rape, and forcible sexual abuse were erroneous as to the required mental state for H.N.'s nonconsent, any such error did not prejudice Norton. *Id.* ¶ 40. Second, the court of appeals determined that the district court did not err in refusing to give certain lesser included offense instructions that Norton had requested. *Id.* ¶¶ 49, 53, 56. It further concluded that at sentencing, the district court correctly determined the

presumptive sentencing tier for the aggravated sexual assault convictions and properly considered all the evidence and argument presented by the parties. *Id.* ¶ 86. It also declined to reverse on cumulative error grounds. *Id.* ¶ 87.

¶30 We granted Norton's petition for certiorari on each of these claims. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶31 "On certiorari, we review for correctness the decision of the court of appeals . . . ." *State v. Levin*, 2006 UT 50, ¶ 15, 144 P.3d 1096.

## ANALYSIS

¶32 We granted certiorari to consider whether the court of appeals erred in (1) concluding that any error in the jury instructions on aggravated sexual assault, rape, and forcible sexual abuse did not prejudice Norton; (2) affirming the district court's refusal to instruct the jury on additional lesser included offenses of aggravated sexual assault, aggravated burglary, and aggravated kidnapping; (3) affirming the district court's sentence of fifteen years to life on both convictions of aggravated sexual assault; (4) concluding that the district court conducted a proper interests of justice analysis at sentencing; and (5) rejecting Norton's claim of cumulative error. We address each issue in turn.

## I. JURY INSTRUCTIONS

¶33 Norton contends that the jury instructions on aggravated sexual assault and the underlying offenses of rape and forcible sexual abuse were incorrect. He argues that the instructions did not adequately explain that to convict, the jury must find that he acted knowingly and intentionally with regard to H.N.'s nonconsent. He further contends that if the jury had been properly instructed, there was a reasonable probability it would have acquitted him on these charges. Norton did not object to these instructions at trial, so he asks us to review this claim for plain error,[3] manifest injustice,[4] and ineffective assistance of counsel.

---

[3] The State argues that we should not conduct a plain error review because Norton invited any error in these instructions. At trial, the district court told counsel that if they did not object to an instruction, the court would assume they approved of it. Norton's counsel did not object to these instructions, and the State argues

(continued . . .)

¶34 The court of appeals assumed without deciding that the jury instructions were incorrect, and it disposed of this issue based on lack of prejudice. *State v. Norton*, 2018 UT App 82, ¶¶ 30–40, 427 P.3d 312. We agree with the court of appeals that even assuming Norton's criticism of these instructions is right, he has not shown prejudice.

¶35 To show plain error or ineffective assistance of counsel, Norton must prove he was prejudiced by the alleged error. *See State v. Jimenez*, 2012 UT 41, ¶ 20, 284 P.3d 640. The prejudice standards for plain error and ineffective assistance are the same. *State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699. Prejudicial error occurs when "there is a reasonable probability" that but for the alleged errors, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶36 Norton argues that the jury instructions did not clearly explain the requisite mens rea regarding H.N.'s nonconsent. At trial, the district court instructed the jury that the State had to "prove a mental state as to each of the . . . counts charged." It then defined the mental states "intentionally"[5] and "knowingly."[6]

---

this is tantamount to invited error. We decline to address the State's argument because we must still analyze prejudice to determine Norton's ineffective assistance of counsel claim. And because we agree with the court of appeals that, even assuming these jury instructions were erroneous, they did not prejudice Norton, his claim fails whether we review it for ineffective assistance, manifest injustice, or plain error.

[4] Our precedent holds that in many instances "'manifest injustice' and 'plain error' are operationally synonymous." *State v. Bullock*, 791 P.2d 155, 159 (Utah 1989); *see also State v. Johnson*, 2017 UT 76, ¶ 57 n.16, 416 P.3d 443; *State v. Maestas*, 2012 UT 46, ¶ 37, 299 P.3d 892. Norton has not argued otherwise; therefore, we review his argument under the plain error standard.

[5] The district court instructed the jury that a "person acts intentionally . . . when his conscious objective is to cause a certain result or to engage in certain conduct." *See* UTAH CODE § 76-2-103(1).

[6] The district court instructed the jury that a "person acts knowingly . . . when the person is aware of the nature of his conduct or is aware of the particular circumstances surrounding

(continued . . .)

¶37 Regarding aggravated sexual assault, the district court instructed the jury that it could find Norton guilty if it found beyond a reasonable doubt that:

> 1. [Norton] raped or attempted to rape or committed forcible sexual abuse or attempted forcible sexual abuse against [H.N.]; and
>
> 2. That in the course of that rape or attempted rape or forcible sexual abuse or attempted forcible sexual abuse [Norton]
>
>> (a) used or threatened [H.N.] with the use of a dangerous weapon; or
>>
>> (b) compelled, or attempted to compel, [H.N.] to submit to rape or forcible sexual abuse by threat of kidnap[p]ing, death, or serious bodily injury to be inflicted imminently; and
>
> 3. That [Norton] did such acts knowingly or intentionally.

¶38 The district court then instructed the jury on rape and forcible sexual abuse. Regarding rape, it instructed the jury that it could convict Norton if it found beyond a reasonable doubt that:

> 1. [Norton] had sexual intercourse with [H.N.]; and
>
> 2. That such conduct was without the consent of [H.N.]; and
>
> 3. That said conduct was done intentionally or knowingly.

¶39 With regard to forcible sexual abuse, the district court instructed the jury that it could convict Norton if it found beyond a reasonable doubt that:

> 1. [Norton] touched the anus, buttocks, breasts, or any part of the genitals of H.N.; and
>
> 2. That such conduct was done with the intent to either
>
>> (a) cause substantial emotional or bodily pain to [H.N.], or

---

his conduct," and when the person is "aware that his conduct is reasonably certain to cause the result." *See id.* § 76-2-103(2).

(b) arouse or gratify the sexual desires of any person; and without the consent of [H.N.]; and

3. That said conduct was done intentionally or knowingly.

¶40  Norton relies on *State v. Barela* to argue that the rape and forcible sexual abuse instructions are incorrect because they "implied that the mens rea requirement . . . applied only to the act of sexual intercourse and not to the alleged victim's nonconsent." 2015 UT 22, ¶ 26, 349 P.3d 676. If these instructions are incorrect, so too is the aggravated sexual assault instruction because it incorporates the instructions for these associated offenses.

¶41  The court of appeals declined to decide whether these instructions were erroneous, instead holding that even if they were, it was not prejudicial error. To determine whether the omission of an element from a jury instruction is prejudicial, we analyze "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Neder v. United States*, 527 U.S. 1, 19 (1999). Here, we ask specifically whether a reasonable jury could have found, based on the "totality of the evidence in the record," that the defendant did not have the required mental state as to the victim's nonconsent. *Barela*, 2015 UT 22, ¶ 31.

¶42  We agree with the court of appeals that a reasonable jury could not have found that Norton mistook H.N.'s conduct for consent based on the totality of the evidence. *Norton*, 2018 UT App 82, ¶¶ 37–40. Because the jury acquitted Norton of the charge of aggravated sexual assault related to squeezing H.N.'s breasts, only the counts based on the nonconsensual intercourse (rape) and digital penetration (forcible sexual abuse) are at issue.

¶43  The trial evidence with respect to these two incidents could not support a finding that Norton may have mistakenly interpreted H.N.'s behavior to indicate consent. With regard to the intercourse, Norton's testimony did not describe ambiguous behavior that he could have believed was consent. Rather, he testified that H.N. initiated sexual activity by sitting on his lap and later climbing on top of him. And in his version of events, the digital penetration never happened. He claimed she fabricated her claims against him. Specifically, he testified that after he returned her to her parents' home he again tried to discuss custody of the children and she threatened to call the police and accuse him of breaking into the house and beating her up.

¶44   And H.N.'s testimony similarly left no room for a finding that Norton mistook her conduct for consent. H.N. had a protective order against Norton. She testified that she had pulled a dryer in front of the basement door when she first moved into her parents' home. And each night she secured the front and back doors by positioning chairs under the doorknobs. Despite her efforts to create a barricade, H.N. testified that Norton broke into the house, punched her in the face, wrapped duct tape around her head and over her mouth, took her into the snowy night with no shoes on, took her to an empty building, and forced her inside at gun point. Once inside, he commanded her to undress at gun point and then raped her. He then tried to get rid of the evidence by directing her to clean up and inserting his fingers into her vagina to "rinse himself out." H.N. testified that she told him "no" multiple times.

¶45   Other evidence corroborated her version of events. The police found strands of hair that resembled H.N.'s in a bathtub in the Fort Douglas building they searched, a wad of duct tape with hair in it in the dumpster behind the building, a mark on H.N.'s lower back, swelling and the beginning of bruising on H.N.'s face, and bruising on her inner thighs and labia.

¶46   Norton points to H.N.'s testimony that she squeezed his penis as evidence that could have persuaded a jury that Norton believed she was consenting. But this incident was characterized by both sides as an act of protest. H.N. testified that in response, Norton grabbed both her hands and pinned them above her head. And Norton did not say in his testimony that he believed the squeeze indicated participation. Rather, he did not mention it. And Norton's counsel argued during closing that the squeeze refuted H.N.'s claim that she was "totally terrified of him" and indicated she was "not afraid to use force" and "not afraid to be confrontational." And even if somehow a reasonable jury could have seen H.N.'s isolated act of squeezing Norton's penis as ambiguous, any ambiguity vanishes when this act is viewed along with the rest of the trial evidence.

¶47   A comparison with the facts in *Barela* helps demonstrate why the jury instructions here were not prejudicial. In *Barela*, a woman claimed her massage therapist raped her. 2015 UT 22, ¶ 6. The therapist claimed the sex was consensual. *Id.* ¶ 5. After a jury convicted the therapist of rape, he challenged on appeal a jury instruction that did not clearly state the required mens rea for the victim's nonconsent. *Id.* ¶¶ 15–16. We agreed and reversed the defendant's convictions. *Id.* ¶ 32.

¶48 This court found that the evidence was such that a jury could have "thought that the truth fell somewhere in between the two accounts." *Id.* ¶ 30. While the victim in that case said the defendant had suddenly instigated and perpetrated the intercourse without her consent, she testified that she "froze," "neither actively participating in sex nor speaking any words," and otherwise expressed no reaction. *Id.* ¶ 29. This court concluded that a jury could have believed that although the victim did not consent, the defendant may have mistakenly thought she did. *See id.* ¶¶ 30–32. Accordingly, we held that it was "reasonably likely" that a proper jury instruction regarding the requisite mental state as to the victim's nonconsent could have affected the outcome of the trial. *Id.* ¶¶ 31–32.

¶49 In contrast, a reasonable jury could not look at the totality of the trial evidence here and find that, under either version of events, Norton may have mistaken H.N.'s conduct for consent. Norton claims H.N. initiated the sexual activity and then manufactured and exaggerated her claims against him. H.N. claims Norton kidnapped her and then raped her at gunpoint. This case does not involve behavior that the jury could have viewed as a close call in either direction.

¶50 Accordingly, this case does not turn on whether Norton may have mistaken H.N.'s conduct for consent. Rather, H.N.'s and Norton's versions of the events in question were mutually exclusive, and the jury had to decide who to believe. We agree with the court of appeals that even assuming the jury instructions were erroneous, it was not reasonably likely that absent the errors the outcome of the trial would have been different.

¶51 While the jury instruction here could have been clearer, *see State v. Newton*, 2020 UT 24, ¶ 29, --- P.3d --- (identifying Model Utah Jury Instruction CR1605 as an example of a clear jury instruction for the offense of rape), we conclude that Norton did not show he was prejudiced by the instruction, and consequently that he failed to establish manifest injustice, plain error, or ineffective assistance of counsel.

## II. LESSER INCLUDED OFFENSES

¶52 Norton argues that the court of appeals erred in affirming the district court's refusal to instruct on additional lesser included offenses of aggravated kidnapping, aggravated burglary, and two of the counts of aggravated sexual assault.

¶53 Relevant here, an offense constitutes a lesser included offense when it is "established by proof of the same or less than all the facts required to establish the commission of the offense

charged" or is "specifically designated by a statute as a lesser included offense." UTAH CODE § 76-1-402(3)(a), (c).

¶54 When a defendant requests an instruction on a lesser included offense, we use the evidence-based standard codified in Utah Code section 76-1-402(4) to determine whether such an instruction is required. *See State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788. We first ask whether the charged offense and the lesser included offense have "some overlap in the statutory elements." *State v. Baker*, 671 P.2d 152, 159 (Utah 1983). We then inquire whether the trial evidence "provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *Id.* at 159 (citation omitted) (internal quotation marks omitted); *see also Powell*, 2007 UT 9, ¶ 24; UTAH CODE § 76-1-402(4). We must determine whether there is "a sufficient quantum of evidence presented to justify sending the question to the jury." *Baker*, 671 P.2d at 159. And we view the evidence "in the light most favorable to the defendant requesting the instruction." *Powell*, 2007 UT 9, ¶ 27.

¶55 The court of appeals carefully analyzed each of Norton's claims of entitlement to an instruction on a lesser included offense. We affirm the court of appeals' decision with regard to all but one of those claims.

*A. Aggravated Kidnapping*

¶56 Norton argues that the court of appeals erred in affirming the district court's refusal to instruct on unlawful detention as a lesser included offense of aggravated kidnapping. We agree with the court of appeals' decision.

¶57 At trial, both parties requested an instruction on kidnapping as a lesser included offense of aggravated kidnapping. Additionally, Norton requested an instruction on unlawful detention. The district court instructed the jury on kidnapping but not unlawful detention. Ultimately, the jury acquitted Norton of aggravated kidnapping but convicted him of kidnapping.

¶58 The State's aggravated kidnapping charge was based on Norton abducting H.N. from the home, duct-taping her head and mouth, and taking her to Fort Douglas where he sexually assaulted her and periodically held her at gunpoint. In contrast, Norton testified that H.N. willingly left her home and accompanied him to the Fort Douglas building. However, he claimed that when they arrived at the empty building they argued, H.N. hit Norton, and he responded by backhanding her. He then restrained H.N.'s hands to prevent her from hitting him

again. On appeal, Norton identifies his testimony that he temporarily restrained H.N.'s hands as being sufficient to require the district court to instruct on unlawful detention.

¶59 Unlawful detention is statutorily defined as a lesser included offense of aggravated kidnapping.[7] UTAH CODE § 76-5-306(2); *see also id.* § 76-1-402(3). But the conduct identified by Norton is a separate act that is not included within the conduct that constituted the greater offense of aggravated kidnapping here. "Even if there is overlap in the statutory elements, if the convictions rely on materially different acts, then one crime will not be a lesser included offense of another." *State v. Garrido*, 2013 UT App 245, ¶ 31, 314 P.3d 1014 (internal quotation marks omitted).

¶60 Norton's testimony that he restrained H.N.'s hands at Fort Douglas is separate, uncharged conduct. As to the conduct that is the basis for the aggravated kidnapping charge—abducting H.N. from the home, taking her to the Fort Douglas building, periodically holding her at gunpoint, and sexually assaulting her—Norton claims it was all voluntary and consensual. Based on the trial evidence, the choice for the jury was to either convict him of aggravated kidnapping or kidnapping based on H.N.'s testimony, or acquit him based on his testimony. If the jury believed Norton's version of events, it could not convict him of restraining H.N.'s hands—a separate act for which he was not charged.

¶61 We also note that Norton's testimony does not appear to even establish the offense of unlawful detention. Unlawful detention requires restraint or detention "without authority of

---

[7] To prove aggravated kidnapping, the State must show in relevant part that "in the course of committing unlawful detention or kidnapping," a person "(a) possesses, uses, or threatens to use a dangerous weapon," or (b) acts with intent "(vi) to commit a sexual offense." UTAH CODE § 76-5-302(1)(a), (1)(b)(vi) (2012). (We cite to the version of the statute in effect at the time of the events in question for this and other statutory provisions that have been substantively amended since that time.) To prove unlawful detention, the State must prove only that an actor "intentionally or knowingly, without authority of law, and against the will of the victim, detains or restrains the victim under circumstances not constituting a violation of: (a) kidnapping . . . or (c) aggravated kidnapping." *Id.* § 76-5-304(1) (2012).

law." UTAH CODE § 76-5-304(1) (2012). But Norton claimed he restrained H.N.'s hands in self-defense to stop her from hitting him, and we must look at the evidence in the light most favorable to him without weighing credibility. *See Powell*, 2007 UT 9, ¶ 27. Restraining another's hands in self-defense is not unlawful. *See* UTAH CODE § 76-2-402(1)(a) (2012) (providing that a "person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of unlawful force"). So Norton's evidence does not amount to unlawful detention.

¶62 Fundamentally, the evidence before the jury provided no rational basis for a verdict acquitting Norton of aggravated kidnapping and instead convicting him of unlawful detention. *See id.* § 76-1-402(4). Accordingly, we agree with the court of appeals that the district court was not obligated to instruct the jury on unlawful detention.[8]

### B. Aggravated Burglary

¶63 Norton argues that he was entitled to instructions on aggravated assault, assault, and criminal trespass as lesser included offenses of aggravated burglary. We agree with the court of appeals that these "are not lesser included offenses of aggravated burglary under the facts of this case." *Norton*, 2018 UT App 82, ¶ 55.

¶64 At trial, the district court instructed on burglary as a lesser included offense of aggravated burglary. But the court did not instruct on aggravated assault, assault, or criminal trespass.

---

[8] The State agrees with the court of appeals that an instruction on unlawful detention was not required here but disagrees with that court's analysis. The State reasons that because the kidnapping was an ongoing crime that continued at Fort Douglas, the evidence of Norton restraining H.N.'s hands was not a separate act. We appreciate the State's point, but we ultimately agree with the court of appeals' analysis for the reasons explained above, *supra* ¶¶ 56–62. The evidence Norton identifies provides a rational basis for a verdict acquitting him of aggravated kidnapping, but not for one convicting him of unlawful detention because the restraint was a separate uncharged act. *See* UTAH CODE § 76-1-402(4).

¶65 Aggravated burglary, aggravated assault, and assault do have overlapping statutory elements.[9] But again, Norton relies on evidence of a materially separate, uncharged act to argue that the district court should have instructed on these offenses.

¶66 The State's aggravated burglary charge was based on the events surrounding Norton breaking into H.N.'s parents' home at the beginning of the night in question. These events included H.N. waking to a "loud bang"—presumably caused by one of the objects she had used to barricade the doors—and finding Norton standing at the end of her bed. He then punched her in the face.

¶67 At trial, Norton denied all of this. He claimed that he did not break into H.N.'s parents' home at the beginning of the night, but that he waited in his car outside of the home for her to willingly join him. However, he points to his testimony that he backhanded H.N. and injured her face at Fort Douglas as supporting instructions on aggravated assault and assault as lesser included offenses of aggravated burglary.

¶68 This is an uncharged act that is separate from the conduct forming the basis of the aggravated burglary charge—Norton breaking into H.N.'s parents' home and punching her in the face. As the court of appeals aptly concluded, "Because the facts and evidence developed to establish the greater offense of aggravated burglary were different from the facts and evidence relied upon

---

[9] At the time of the conduct at issue, aggravated burglary occurred when a person "in attempting, committing, or fleeing from a burglary . . . (a) cause[d] bodily injury to any person who [was] not a participant in the crime; (b) use[d] or threaten[ed] the immediate use of a dangerous weapon against any person who [was] not a participant in the crime; or (c) possesse[d] or attempt[ed] to use any explosive or dangerous weapon." *Id.* § 76-6-203(1).

An aggravated assault occurred if a person "commit[ed] assault" and used "(a) a dangerous weapon . . . or (b) other means or force likely to produce death or serious bodily injury." *Id.* § 76-5-103(1).

And an assault was "(a) an attempt, with unlawful force or violence, to do bodily injury to another; (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or (c) an act, committed with unlawful force or violence, that cause[d] bodily injury to another or create[d] a substantial risk of bodily injury to another." *Id.* § 76-5-102(1) (2012).

by Norton to claim entitlement to the lesser included offense instructions of aggravated assault and assault, those lesser offenses were not included within the greater offenses." *Id.* ¶ 56.

¶69 Norton's testimony about this uncharged conduct provides a basis for an additional offense but not a lesser offense included within the conduct for which he was actually charged. Accordingly, the evidence at trial did not provide a rational basis for a verdict acquitting Norton of aggravated burglary or burglary and instead convicting him of aggravated assault or assault. So the district court was not required to give the lesser included offense instructions he requested.

¶70 Norton also argued to the court of appeals that he was entitled to an instruction on criminal trespass because he went to H.N.'s residence at the end of the night, which the protective order prohibited. *See id.* ¶ 56 n.13. Because Norton's trial counsel did not request a criminal trespass instruction, Norton raises this argument based on ineffective assistance of counsel. *See id.*

¶71 The court of appeals concluded again that because of the different underlying conduct that Norton relied on to make his argument, "criminal trespass was not an included offense of aggravated burglary under the circumstances of this case, and Norton's counsel was therefore not ineffective for failing to request criminal trespass as a lesser included instruction." *Id.*

¶72 The court of appeals was correct. Norton's testimony about going to H.N.'s parents' home at the end of the night is separate from his breaking into the house at the beginning of the night. It is uncharged conduct. If it did support a conviction for criminal trespass, that conviction would not be in lieu of burglary but in addition to it. Accordingly, the district court was not required to instruct on criminal trespass and Norton's counsel was not ineffective for not requesting such an instruction.

*C. Aggravated Sexual Assault Based on Rape*

¶73 Norton argues that the district court erred in declining to instruct the jury on sexual battery as a lesser included offense of aggravated sexual assault based on rape. But we agree with the court of appeals that the district court did not err in refusing to give such an instruction.

¶74 At trial, Norton and the State requested instructions on rape, forcible sexual abuse, and sexual battery as lesser included offenses of aggravated sexual assault based on rape. The district court did instruct the jury on rape and forcible sexual abuse, but not on sexual battery. Although the jury was instructed on two

lesser included offenses, it convicted Norton of aggravated sexual assault as charged.

¶75 The offenses of aggravated sexual assault based on the underlying offense of rape and sexual battery have overlapping elements.[10] Norton argues that he was entitled to a sexual battery instruction because the jury could have disbelieved H.N. or found that she exaggerated her allegations to gain an advantage in the custody battle. Norton also asserts that her testimony about the rape was ambiguous because she did not struggle after he initiated sex, except to squeeze his penis. And he argues that in light of his testimony that the sex was consensual, the jury could have found that no rape occurred, but when Norton held her hands above her head, that particular sexual position might have caused her momentary affront or alarm.

¶76 This is pure speculation. Norton has not identified a quantum of evidence presented at trial that would support instructing the jury on sexual battery. Norton testified that the sexual intercourse was entirely consensual and that H.N. was an active participant. The only testimony about him pinning H.N.'s hands above her head came from her. And she testified that she did not consent to any sexual activity, and that when he held her hands above her head it was in response to her squeezing his penis. There was no evidence to support a finding that the

_____

[10] The relevant statutory language provides, "A person commits aggravated sexual assault if: (a) in the course of a rape . . . or forcible sexual abuse, the actor: (i) uses, or threatens the victim with the use of, a dangerous weapon" or "(ii) compels, or attempts to compel, the victim to submit to rape . . . or forcible sexual abuse[] by threat of kidnap[p]ing, death, or serious bodily injury to be inflicted imminently on any person." UTAH CODE § 76-5-405(1).

"A person commits rape when the actor has sexual intercourse with another person without the victim's consent." *Id.* § 76-5-402(1).

"A person is guilty of sexual battery if the person, under circumstances not amounting to" rape, forcible sexual abuse, attempted rape, or attempted forcible sexual abuse, "intentionally touches, whether or not through clothing, the anus, buttocks, or any part of the genitals of another person, or the breast of a female person, and the actor's conduct is under circumstances the actor knows or should know will likely cause affront or alarm to the person touched." *Id.* § 76-9-702.1(1).

intercourse was consensual, but Norton should have known that H.N. intermittently experienced affront or alarm. Accordingly, the evidence did not provide a rational basis to acquit Norton of rape and instead convict him of sexual battery. *See* UTAH CODE § 76-1-402(4). So no such instruction was required.

### D. Aggravated Sexual Assault Based on Forcible Sexual Abuse

¶77 Norton also argues that the court of appeals erred in affirming the district court's refusal to instruct on sexual battery as a lesser included offense of aggravated sexual assault based on forcible sexual abuse. We agree with Norton that an instruction on sexual battery was required.

¶78 First, aggravated sexual assault based on forcible sexual abuse and sexual battery have "some overlap in the statutory elements." *Baker*, 671 P.2d at 159. Both offenses require that the actor touches the anus, buttocks, or any part of the genitals of another. *See* UTAH CODE §§ 76-5-404(1), 76-5-405(1), and 76-9-702.1(1) (2012). But they have different requisite mental states. Forcible sexual abuse requires that the defendant act with the intent to cause substantial emotional or bodily pain or to gratify the sexual desire of any person. *Id.* § 76-5-404(1) (2012). But sexual battery requires only that the defendant's conduct be under circumstances that the defendant knows or should know would cause affront or alarm to the person touched. *Id.* § 76-9-702.1(1).

¶79 Second, we conclude that "the evidence offered provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *Baker*, 671 P.2d at 159 (citation omitted) (internal quotation marks omitted); *see also* UTAH CODE § 76-1-402(4). Here, both the State and Norton rely on H.N.'s testimony that Norton inserted his finger into her vagina to wipe away his DNA. Norton's testimony was that this touch did not happen. But relying on H.N.'s testimony that the touch occurred, Norton argues that the evidence, if believed, would support a finding that Norton "touched [H.N.] under circumstances he knew or should have known would likely cause affront or alarm" (the mental state required for sexual battery), rather than with intent to cause substantial emotional or bodily pain or to gratify his sexual desire (the mental state required for forcible sexual abuse).

¶80 We agree. H.N.'s testimony indicates Norton was attempting to conceal his crime. While a jury could infer that in doing so he also intended to gratify his sexual desire or cause H.N. emotional or bodily pain, a jury could also infer from the same evidence that Norton touched H.N.'s vagina only under

circumstances he knew or should have known would likely cause her affront or alarm. The trial evidence therefore provides a rational basis for a verdict acquitting Norton of aggravated sexual assault based on forcible sexual abuse and convicting him of sexual battery.

¶81 We must now determine whether this error prejudiced Norton. An error is prejudicial if there is a "reasonable likelihood that the error affected the outcome of the proceedings." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (citation omitted).

¶82 We conclude this error did prejudice Norton because had the jury been instructed on sexual battery, the evidence supported a conviction on the less serious charge and an acquittal on both aggravated sexual assault and the lesser included offense on which the district court instructed—forcible sexual abuse. Here, although the district court instructed on the lesser included offense of forcible sexual abuse, the jury convicted Norton on aggravated sexual abuse as charged. Generally,

> [w]here a jury is instructed on, and has the opportunity to convict a defendant of, a lesser included offense, but refuses to do so and instead convicts the defendant of a greater offense, failure to instruct the jury on another lesser included offense, particularly an offense that constitutes a lesser included offense of the lesser included offense that the jury was instructed on, is harmless error.

*State v. Daniels*, 2002 UT 2, ¶ 28, 40 P.3d 611.

¶83 However, this is a distinct situation and causes us to depart from our more general precedent. If the jury were to infer from H.N.'s testimony that Norton acted under circumstances that he knew would cause her affront or alarm, but did not intend to gratify his sexual desire or cause her emotional or physical pain, that would lead to acquittal of both aggravated sexual assault and forcible sexual abuse and conviction of sexual battery. Thus, there is a reasonable likelihood that the error affected the outcome of the proceedings. Accordingly, we conclude that the district court's error prejudiced Norton and reverse the court of appeals' affirmance of Norton's conviction of aggravated sexual assault based on digital penetration.

## III. SENTENCING

¶84 The longest potential terms of imprisonment Norton faced at sentencing were for his two aggravated sexual assault convictions. The district court sentenced him to fifteen years to life

in prison on both of them. He argues that this was error and that the court of appeals should have reversed for two reasons.[11]

## A. Special Verdict Form

¶85 Norton argues that the district court should not have applied the sentencing tier applicable to aggravated assault based on a completed act of rape because the jury was not given a special verdict form to indicate which underlying sexual assault offense formed the basis of the conviction. In light of this, Norton argues the district court should have sentenced him to the lowest term of six years to life—the sentencing range corresponding to an aggravated sexual assault conviction based on attempted forcible sexual abuse. UTAH CODE § 76-5-405(2)(c)(i).

¶86 The court of appeals held that the district court did not err because there was no factual basis "to support a conclusion that the jury could have determined that the sexual acts underlying [the charge] constituted only attempted forcible sexual abuse." *State v. Norton*, 2018 UT App 82, ¶ 61, 427 P.3d 312.

¶87 While we affirm the court of appeals' conclusion that the district court applied the correct sentencing tier, we do so on an alternative basis. We conclude that Norton did not preserve this issue in the district court.

¶88 At trial, the district court instructed the jury that aggravated sexual assault occurs when a person commits a sexual assault such as rape, forcible sexual abuse, attempted rape, or attempted forcible sexual abuse, and does so under certain aggravating circumstances. UTAH CODE § 76-5-405(1). The presumptive sentence for aggravated sexual assault varies based on the underlying offense from which it arises. *Id.* § 76-5-405(2). If the underlying offense is rape or forcible sexual abuse, the presumptive sentence is fifteen years to life. *Id.* § 76-5-405(2)(a)(i). If the underlying offense is attempted rape, the presumptive sentence is ten years to life. *Id.* § 76-5-405(2)(b)(i). And if the underlying offense is attempted forcible sexual abuse, the presumptive sentence is six years to life. *Id.* § 76-5-405(2)(c)(i). A court may impose a lesser term if it finds that doing so is in the

---

[11] As we have reversed the conviction for aggravated sexual assault based on forcible sexual abuse, only the conviction for aggravated sexual assault based on rape remains. Consequently, we analyze Norton's argument only with respect to the remaining count.

interests of justice and states the reasons for that finding on the record. *Id.* § 76-5-405(3)(a), (4)(a), (5)(a).

¶89 At trial, defense counsel and the State reviewed the jury instructions and neither requested a special verdict form. So when the jury rendered its verdict, it did not identify the offense underlying the aggravated sexual assault conviction.

¶90 At sentencing, Norton argued that without a special verdict form there was no indication the jury found him guilty of aggravated sexual assault based on anything but the least serious offense of attempted forcible sexual abuse. He asserted that consequently he should be sentenced only under the corresponding sentencing tier of six years to life.

¶91 In response, the State argued that all evidence presented at trial was of completed, not attempted, sexual assaults. So Norton should be sentenced in accordance with the tier corresponding to aggravated sexual assault based on a completed act of rape. The district court agreed that fifteen years to life was the presumptive punishment tier, given the evidence presented at trial.

¶92 Norton argues that this deprived him of the due process guarantee of "the right to a jury trial on every element of the offense." But Norton did not raise this argument until sentencing, and that was too late.

¶93 "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. During trial, the parties met with the district court to finalize the jury instructions. This was the appropriate time for Norton to request that a special verdict form be included. But he made no mention of a special verdict form. Rather, Norton raised the issue at sentencing when it was too late for the district court to remedy the issue.

¶94 This conclusion is contrary to that of our court of appeals, which held the issue was preserved because Norton "made these same arguments to the court below." *Norton*, 2018 UT App 82, ¶ 59 n.15. It is correct that Norton made this argument at sentencing. However, our preservation rules ensure that issues are addressed and, if appropriate, corrected when they arise. *Holgate*, 2000 UT 74, ¶ 11. Had Norton requested a special verdict form at trial, the district court could have included a form or denied his request. But at sentencing, it was too late for the district court to do either. Accordingly, Norton's claim is unpreserved. *See State v. Cram*, 2002 UT 37, ¶ 11, 46 P.3d 230 (concluding that an objection was not preserved because it could have been raised at

trial but was instead raised at a scheduling conference where the error could no longer be corrected). Because Norton has not argued any exception to the preservation requirement here, his claim fails.[12]

### *B. Interests of Justice*

¶95 Norton also argues that the district court erred in not sentencing him to a lesser sentence "in the interests of justice." UTAH CODE § 76-5-405(3)(a). Specifically, Norton claims that in sentencing him to the presumptive sentence of fifteen years to life on his aggravated assault sexual conviction, *see id.* § 76-5-405(2)(a)(i), the district court did not conduct the interests of justice analysis or make the explicit findings required by *LeBeau v. State*, 2014 UT 39, 337 P.3d 254. He argues this was an abuse of discretion.

¶96 "We traditionally afford the trial court wide latitude and discretion in sentencing." *State v. Woodland*, 945 P.2d 665, 671 (Utah 1997). We will not set aside a sentence unless the district court abused its discretion by "fail[ing] to consider all legally relevant factors or if the sentence imposed is clearly excessive." *State v. McCovey*, 803 P.2d 1234, 1235 (Utah 1990) (*abrogated on other grounds by State v. Smith*, 2005 UT 57, 122 P.3d 615) (footnote omitted) (internal quotation marks omitted).

¶97 But relying on our holding in *LeBeau*, Norton argues the district court should have *sua sponte* analyzed the proportionality

---

[12] In any event, Norton's argument does not persuade us that the absence of a special verdict form was plain error. Norton relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013) to argue that in the instance of a tiered sentencing structure, where the jury is instructed on versions of the offense that qualify for more than one tier, a special verdict form is required. But this is an extension of *Apprendi* and *Alleyne*. In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). In *Alleyne*, the Supreme Court extended the same holding to any fact that increases the mandatory minimum sentence. 570 U.S. at 108. And Norton does not explain why *Apprendi* and *Alleyne* require a special verdict form under the circumstances here.

of his sentence and his potential for rehabilitation. In determining proportionality, Norton argues that the court should have considered both the gravity of his conduct in relation to the severity of the sentence imposed on him, and the severity of his sentence relative to sentences imposed for other crimes in Utah. And he argues that in analyzing his rehabilitative potential, the district court should have considered the Board of Pardons' role in monitoring his behavior and progress toward rehabilitation, his age, any ties between the crime and alcohol or drug addiction and his treatment prospects, the existence of a criminal history of violence, and the "Sentencing Commission's guidelines." (Citing *LeBeau*, 2014 UT 39, ¶¶ 52, 54.)

¶98   However, as we made clear in *State v. Martin*, the district court does not have an obligation to consider anything the defendant does not raise. 2017 UT 63, ¶ 62, 423 P.3d 1254 ("[W]hen a sentencing court commits an error that was not objected to below, an appellant must . . . show the existence of plain error or exceptional circumstances that would justify the exercise of our review."). Rather, the district court need only consider the arguments and issues the defendant raises at sentencing.

¶99   And as the court of appeals correctly observed, the district court considered all of the evidence and arguments Norton presented at sentencing. The district court acknowledged letters describing Norton as a good person, as well as letters describing Norton as a violent person. The court also acknowledged Norton was going through a devastating divorce but determined Norton's behavior was still "way, way, way over the line." Further, the court noted that a factor of the sentence was Norton's "inability and unwillingness to follow the truth." Ultimately, the district court decided Norton was "entitled to some mercy, but not what [his] lawyer [was] asking for."

¶100  But Norton argues that the district court failed to consider whether his sentence was proportional to sentences for other similar crimes. And he contends that he raised this at sentencing when he argued his conduct did not "rise to the level of the kinds of egregious cases where we have individuals who suffered significant loss of life or impairment." But this is not enough. In *Martin*, we held a similar sentencing issue was unpreserved because counsel did not object to the analysis the district court used or identify the other offenses the court should take into consideration. *Id.* ¶¶ 64–66. Comparing sentences is "daunting" and "certainly not a task that we can require our district courts to perform without prompting or guidance from

counsel." *Id.* ¶ 66. Norton did not ask the district court to compare his sentence to sentences imposed for other offenses or identify what those other offenses might be. Accordingly, this issue is unpreserved.

¶101 The district court adequately addressed the arguments Norton raised at sentencing. We affirm the court of appeals' decision that the district court did not abuse its discretion by declining to reduce the presumptive sentence on the basis of the "interests of justice."

## IV. CUMULATIVE ERROR

¶102 Norton argues that the court of appeals erroneously rejected his cumulative error argument. An appellate court will reverse if "the cumulative effect of the several errors undermines [the court's] confidence . . . that a fair trial was had." *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (second alteration in original) (citation omitted). However, we have identified only one error in Norton's trial. A "single accumulable error cannot warrant reversal under the cumulative error doctrine." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 48, 428 P.3d 1038. We thus reject his cumulative error argument.

## V. *LEBEAU* SHOULD BE OVERRULED

¶103 Although *LeBeau v. State*, 2014 UT 39, 337 P.3d 254 does not determine the outcome in this case, I write this section separately because I conclude *LeBeau* should be explicitly overturned. The holding in *LeBeau* contradicts the applicable statute's plain language. And in so doing it takes the legislature's policy choice to give judges discretion to sentence below the presumptive statutory tier and replaces it with a rigid, mandatory framework that applies even when a judge imposes the presumptive sentence.

¶104 I agree with Justice Lee's dissent in *LeBeau*, but I will not duplicate his analysis here. Instead, I add my own observations and apply the law outlined in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553, to argue that *LeBeau* should be overruled.

¶105 When considering whether precedent should be overturned, we evaluate: "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." *Id.* ¶ 22.

¶106 The first consideration—the persuasiveness of the authority and reasoning on which *LeBeau* is based—counsels in favor of overturning it. The opinion did not derive from prior

authority. It was a fresh interpretation of a provision of Utah's aggravated kidnapping statute, which I conclude is incorrect. *Lebeau*, 2014 UT 39, ¶ 25.

¶107 The *LeBeau* court interpreted the sentencing scheme within the aggravated kidnapping statute.[13] *Id.* ¶¶ 20–22; *see also* UTAH CODE § 76-5-302(3), (4) (2014). Subsection 302(3) of the statute establishes presumptive sentencing tiers for variations of aggravated kidnapping. Subsection 302(4) then states in relevant part,

> If, when imposing a sentence under Subsection (3)(a) or (b), a court finds that a lesser term than the term described in Subsection (3)(a) or (b) is in the interests of justice and states the reasons for this finding on the record, the court may impose a [lesser] term of imprisonment . . . .

UTAH CODE § 76-5-302(4) (2014).

¶108 Reading subsections 302(3) and (4) together, the *LeBeau* court held that the district court was required to conduct "the interests-of-justice analysis laid out in subsection (4)."[14] *Lebeau*, 2014 UT 39, ¶ 21. And the *LeBeau* court defined the phrase "interests of justice" by looking to Eighth Amendment jurisprudence, *see id.* ¶¶ 38–41, and another provision of the criminal code setting forth "general goals of Utah's criminal code." *Id.* ¶ 34 (quoting UTAH CODE § 76-1-104 (2014)). These sources led the court to conclude that an "interests-of-justice analysis" required the sentencing court to consider a checklist of particulars: (1) proportionality, including "the gravity of the offense and the harshness of the penalty," and "the sentence being imposed [compared to] sentences imposed for other crimes in Utah" and (2) the defendant's capacity for rehabilitation,

---

[13] To be consistent with *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, I cite the 2014 version of the statute.

[14] The *LeBeau* court reasoned that because the provisions within subsection 302(3) (establishing the presumptive sentencing tiers for aggravated kidnapping) state that they are to be imposed "except as provided in Subsection . . . (4)" (the "interests of justice" provision), then courts must always conduct an interests of justice analysis to determine whether subsection (4) applies. *LeBeau*, 2014 UT 39, ¶ 21. And the court concluded that an "interests of justice analysis" required a judge to consider specific factors as described above, *supra* ¶ 97.

including deference to the role of the Board of Pardons and Parole, the defendant's age at the time of the crime, the extent that alcohol or drug addiction caused the offense, the presence of violence in the defendant's criminal history, relevant Sentencing Commission guidelines, and "all relevant factors" to the defendant's rehabilitative potential. *Id.* ¶¶ 42–55.

¶109 But I find it unnecessary to go beyond the language of the statute to determine its meaning. Subsection 302(4) is straightforward. It directs that if the sentencing court finds it is "in the interests of justice" to sentence a defendant to a "lesser term" rather than the presumptive term, the court may do so if it states the reasons for this finding on the record.

¶110 Two things seem clear from the plain language of this statute. First, it applies only if "a court finds that a *lesser* term" is in the interests of justice. Where, as here and in *LeBeau*, a judge sentences a defendant to the presumptive term, subsection 302(4) should not come into play.

¶111 And second, this provision is permissive, not mandatory, and it does not require judges to consider a list of particulars. It states that judges "may" sentence below the presumptive sentencing tier if they determine it is in the "interests of justice." The sole intent is to give judges discretion to impose a lesser term of imprisonment rather than making the presumptive tier mandatory.

¶112 "May" is, of course, a permissive term. In this context it means to "be permitted to" or to "be a possibility." *May*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶113 And the phrase "interests of justice" is merely a "general placeholder for a principle of broad judicial discretion." *LeBeau*, 2014 UT 39, ¶ 87 (Lee, J., dissenting). The *LeBeau* majority observed the many times that the phrase "interests of justice" can be found in the civil code, criminal code, rules of evidence, and rules of procedure. *Id.* ¶ 28. This reinforces my point. Various statutes and rules invoke the "interests of justice" to signal that judges have the discretion to consider whatever information is before them and do what is fair, proper, or just under the circumstances. *See id.* ¶ 90 (Lee, J., dissenting); *see, e.g.*, UTAH CODE § 75-7-204(2)(b) (providing that a court "may entertain a proceeding regarding any matter involving a trust if . . . the interests of justice would be seriously impaired"); *id.* § 77-8a-1(2)(d) ("When two or more defendants are jointly charged with any offense, they shall be tried jointly unless the court in its discretion on motion or otherwise orders separate trials consistent

with the interests of justice."); *id.* § 78B-1-136 ("It is the right of a witness to be protected from irrelevant, improper or insulting questions, and from harsh or insulting demeanor, to be detained only so long as the interests of justice require it . . . .").

¶114   However, *LeBeau* turns this statutory language on its head. It transforms the grant of discretion inherent in the phrase "interests of justice" into a prescribed analysis that judges must undertake. And it requires judges to perform this analysis even when they have applied the presumptive sentence. *LeBeau*, 2014 UT 39, ¶ 55. These mandates are not found in the statute's language.

¶115   In determining whether precedent should be overturned, we also ask how firmly the precedent has become established in the law since it was handed down. To do so, we look to both the age of the precedent and the "extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Eldridge*, 2015 UT 21, ¶¶ 22, 35. Other relevant considerations are how well the precedent has worked in practice and "whether the precedent has become inconsistent with other principles of law." *Id.* ¶ 40.

¶116   *LeBeau* was decided in 2014 and was not based on "any significant precursors in Utah law." *Id.* ¶ 34. Since that time, it "has not been necessary to the outcome of many cases." *Id.* ¶ 36. In its six years of existence, *LeBeau* has been cited approximately twenty-five times by this court, the court of appeals, and Utah's federal courts.

¶117   Prior to this case, this court has conducted a *LeBeau* interests of justice analysis only one time in *State v. Martin*, 2017 UT 63, 423 P.3d 1254. There, we declined to reverse a district court that had not undertaken a formal proportionality analysis on the record as required by *LeBeau*. *Id.* ¶ 66. We recognized the "daunting task" involved in undertaking a proportionality analysis: "[I]t is certainly not a task that we can require our district courts to perform without prompting or guidance from counsel." *Id.*

¶118   Our court of appeals has handled most of the cases involving a *LeBeau* claim. Eighteen court of appeals opinions cite *LeBeau*. One is this case, and nine others cite *LeBeau* for other propositions—not the interests of justice analysis. That means there have been eight court of appeals cases involving a *LeBeau* interests of justice claim. The court of appeals has only once concluded that *LeBeau* warranted a holding that a district court abused its discretion. *See State v. Jaramillo*, 2016 UT App 70, ¶ 44,

372 P.3d 34. In every other case, the court of appeals either declined to conduct the *LeBeau* interests of justice analysis or decided there was no abuse of discretion. *See, e.g., State v. Alvarez*, 2017 UT App 145, ¶ 4, 402 P.3d 191 (assuming "that the sentencing court duly considered the proportionality of [the defendant's] sentence" because the defendant did not demonstrate "that [the court's] presumption of appropriate sentencing consideration is inapplicable"); *State v. Scott*, 2017 UT App 103, ¶ 13, 400 P.3d 1172 (presuming "that the court fully considered all the information presented to it" and took into account "the relevant factors in determining [the defendant's] sentence"); *State v. Beagles*, 2017 UT App 95, ¶ 9, 400 P.3d 1096 (holding that the district court "balanced the aggravating and mitigating factors" and that its sentencing decision was within its discretion).

¶119 And the court of appeals has sharply criticized *LeBeau*. In *State v. Coombs*, where a defendant raised an ineffective assistance of counsel claim because his counsel had not argued at sentencing that the district court should conduct the interests of justice analysis required by *LeBeau*, the court critiqued *LeBeau*: "In our view, *LeBeau* constitutes blatant policy-based ad hoc review of legislative action not typically undertaken by the judicial branch. We would hope that, given the appropriate opportunity, our supreme court will revisit whether *LeBeau*'s approach should continue." 2019 UT App 7, ¶ 22 n.4, 438 P.3d 967 (citation omitted). The court of appeals concluded, "We cannot read *LeBeau* and *Martin* as removing from defense counsel the discretion *not* to make certain arguments at sentencing. Every case is different and defense counsel must retain wide discretion in determining what arguments will best benefit a client under the totality of the circumstances." *Id.* ¶ 21 n.3 (citation omitted).

¶120 It appears that in the time since *LeBeau* was decided, appellate courts have responded to it by applying it narrowly. This suggests *LeBeau*'s mandates are not workable as written.[15]

¶121 On balance, the trouble with *LeBeau* is not so much its mandate that judges consider the interests of justice before imposing a sentence. After all, this is what judges already do. They receive and consider any testimony, evidence, or information that either party desires to present. UTAH CODE § 77-

---

[15] Without published opinions, it is more difficult to determine how district courts have responded to its requirements.

18-1(7). They give the defendant an opportunity to make a statement and present any mitigating information. And they give the prosecution a similar opportunity to present any information "material to the imposition of sentence." UTAH R. CRIM. P. 22(a). They receive information about any victims of the offense. *See* UTAH CODE § 77-38-4(1); *see also id.* § 77-18-1(5)(b)(i). They read any materials that have been submitted, such as a presentence report or letters. *Id.* § 77-18-1(5)(a)–(b). And defense counsel and the prosecutor use their professional judgment to choose which arguments to make and which information to highlight in support of their respective sentencing positions. Judges consider all of this, along with any applicable statutes and the sentencing guidelines, and impose the sentence they deem to be just under all the circumstances. *State v. Russell*, 791 P.2d 188, 192 (Utah 1990).

¶122   Rather, the more serious problem with *LeBeau* is that instead of reading the "interests of justice" as a grant of discretion, the *LeBeau* court concluded this phrase requires judges to go through a prescribed checklist of factors at sentencing, and that judges must do so whether they impose a sentence less than the presumptive range or within it.

¶123   This transforms a particular legislative policy decision into something else entirely. Here and in similarly worded statutes, the legislature has determined that Utah judges should have the discretion to sentence below the presumptive statutory term when they determine it is in the interests of justice—in other words, fair and just—to do so. This is a significant policy choice, which stands in contrast to other jurisdictions that have chosen to enact statutory mandatory minimum sentencing schemes that are binding upon judges in all but narrow circumstances. *See, e.g.*, 18 U.S.C. § 3553(e) (granting federal sentencing court authority to impose sentence below the statutory minimum only upon a government motion stating that the defendant gave "substantial assistance" in the investigation or prosecution of another person who has committed an offense); *id.* § 3553(f) (requiring a court to sentence without regard to a statutory minimum sentence when a defendant meets specific criteria). Instead of observing this fundamental aspect of the sentencing scheme enacted by the legislature, *LeBeau* transforms this general grant of discretion into something detailed and specific, which is not found in the text of the relevant statutes.

¶124   Because I advocate for *LeBeau* to be overturned even though it does not determine the result in this case, the concurrence asserts that my analysis is an "act of judicial overreach." *See infra* ¶ 130. I agree with the concurrence that the

DURRANT, C.J., concurring in part and concurring in the judgment

doctrine of *stare decisis* is deeply rooted in our law. We should be extremely reluctant to overturn precedent. And generally, that means we will not revisit precedent when it does not dictate our holding in a particular case.

¶125   But I conclude that the fact that *LeBeau* does not govern here—indeed, the fact that it "has not been necessary to the outcome of many cases," *Eldridge*, 2015 UT 21, ¶ 36—indicates that it has not become firmly "established in the law since it was handed down," *id.* ¶ 22. This, along with the court of appeals' criticism of *LeBeau* and explicit request that this court "revisit whether *LeBeau*'s approach should continue," *Coombs*, 2019 UT App 7, ¶ 22 n.4, suggests that *LeBeau* has not been workable in practice and weighs in favor of overruling it.

¶126   For these reasons, I am persuaded that this is one of the rare occasions when we should overturn precedent.

## CONCLUSION

¶127   We affirm all but one of the court of appeals' determinations in this case. We conclude that any error in the jury instructions for aggravated sexual assault and the underlying offenses of rape and forcible sexual abuse did not prejudice Norton. Further, the district court was not required to instruct on any of the lesser included offenses Norton requested, except for sexual battery. And we determine that at sentencing, the district court did not err in imposing a punishment of fifteen years to life for aggravated sexual assault and properly considered all of the arguments and evidence before it.

¶128   With regard to our holding that the district court erred in not instructing the jury on sexual battery as a lesser included offense of the aggravated sexual assault charge based on forcible sexual abuse, we reverse the conviction and remand to the district court for a new trial.

———————————

CHIEF JUSTICE DURRANT, concurring in part and concurring in the judgment:

¶129   Writing for the majority, Justice Petersen does an able and thorough job of addressing each of Mr. Norton's challenges to his conviction. And she appropriately dismisses his *LeBeau* challenge to his sentence as unpreserved. So far so good. We are therefore pleased to concur in the analysis and conclusions she sets forth in parts I through IV of her opinion. But then, she takes

DURRANT, C.J., concurring in part and concurring in the judgment

a surprising step. She goes on to address the question of whether the rule established in *LeBeau*[16] should be overturned. This, despite the fact that the resolution of this question makes not one wit of difference to Mr. Norton's case. Justice Petersen explicitly acknowledges as much, writing that *LeBeau* "does not determine the outcome in this case."[17] But the fact that this is done in plain sight makes it no less an act of judicial overreach.

¶130   And Justice Petersen further flouts judicial restraint by not just reaching the issue unnecessarily, but then advocating to overturn *LeBeau*, a significant case that, whether right or wrong, is established precedent.[18] The doctrine of *stare decisis* is deeply rooted in our law. There are reasons why we respect precedent. There are reasons why we are circumspect in overturning it. Precedent promotes predictability and stability in the incremental development of the law. It promotes faith in our judicial system. It underpins and informs virtually every decision we make as judges. This is not to say it is wholly inviolate. We, of course, do on occasion overturn a case. But we do not do it lightly. We do it reluctantly, cautiously, and with compelling reasons. And we should never do it gratuitously as Justice Petersen suggests we do here. For these reasons, we decline to join in part V of Justice Petersen's opinion.

––––––––––––––––

---

[16] *LeBeau v. State*, 2014 UT 39, 337 P.3d 254.

[17] *Supra* ¶ 105.

[18] *See State v. Rowan*, 2017 UT 88, ¶ 24, 416 P.3d 566 (Himonas, J., concurring) (explaining, in a concurrence joined by a majority of the court, that "our court declines to revisit established precedent unnecessarily").